Grover C. CLAYTOR, et al., Appellants,

v.

OWENS–CORNING FIBERGLAS
CORPORATION, et al.,
Appellees.

No. 92–CV–39.

District of Columbia Court of Appeals.

Argued April 7, 1993.

Decided Aug. 3, 1995.

Edward J. Lilly, with whom Peter G. Angelos and Michael T. Edmonds were on the brief, for appellants.

John F. Mahoney for appellee Owens–Corning Fiberglas Corp.

Julia K. Evans, with whom Dana C. Petersen was on the brief, for appellee Owens–Illinois, Inc.

Robin Silver, with whom Carolyn J. Moses was on the brief, for appellee GAF Corp.

Wendy W. Wanchak, with whom Kenneth R. Neal was on the brief, for appellee Pittsburgh Corning Corp.

Before TERRY, SCHWELB,[*] and KING,[**] Associate Judges.

TERRY, Associate Judge:

Appellants Grover Claytor, Frank Keelan, Chester Turner, and their wives filed suit against several manufacturers and suppliers of asbestos products, seeking compensation for injuries allegedly resulting from exposure to asbestos.[1] The trial court entered summary judgment against appellants on most of their claims. Appellants bring this appeal against only four of the original defendants: Owens–Corning Fiberglas Corporation, Owens–Illinois, Inc., Pittsburgh Corning Corporation, and GAF Corporation. Each pair of appellants seeks slightly different relief. Specifically, (1) the Claytors seek reversal of the judgment in favor of Owens–Corning and Owens–Illinois, (2) the Keelans seek reversal of the judgment in favor of Owens–Corning, Pittsburgh Corning, and GAF, and (3) the Turners seek reversal of the judgment in favor of Owens–Corning and GAF.

The motions for summary judgment asserted that there was insufficient evidence, and in some cases no evidence, to prove that appellees' products caused injury to appellants. The trial court, applying in large part the evidentiary standard for asbestos cases developed in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986), held that appellants could not establish that the products manufactured or supplied by these appellees were a "substantial factor" in causing appellants' asbestos-related diseases. Appellants contend on appeal that the *Lohrmann* standard may not be "proper in this jurisdiction"; that even if it is "proper," the trial court misapplied it; and that there are substantial factual issues affecting all of their claims which may be decided only by a jury.

We need not decide whether the test developed by the *Lohrmann* court, or any other special test, should be adopted for use in asbestos-related cases. Instead, in reviewing the trial court's grant of summary judgment, we apply the "substantial factor" test established long ago in this jurisdiction, and in doing so we conclude that, in almost every respect, the judgment must be affirmed. We hold that, even when the evidence is viewed in the light most favorable to appellants, it is insufficient to support a jury verdict in favor of Claytor and Keelan, and hence we affirm the entry of summary judgment against them. With respect to Turner, we affirm the summary judgment against him in favor of GAF Corporation but reverse, for reasons which we shall explain, the judgment against him in favor of Owens–Corning.

I

Appellees' motions for summary judgment asserted that there was no evidence that products manufactured or supplied by them caused appellants' asbestos-related illnesses. In particular, appellees maintained that appellants could not identify appellees' products as the ones that caused their injuries, or even prove that their products were a "substantial factor" in causing the alleged injuries. Appellants responded by citing portions of their own deposition testimony, as well as the deposition testimony of others who had worked with products manufactured or supplied by appellees, in an attempt to place appellees' products at or near locations where they had worked. Appellants also submitted affidavits and portions of depositions from two experts.

### A. Appellants' Deposition Testimony

#### 1. Claytor

Grover Claytor's career as a welder and pipefitter spanned almost fifty years, from 1938 to 1986. He "guess[ed]" that he began working with asbestos in 1938, when he worked on automobiles at Acme Welding Company and used wet asbestos on hot brake and gas lines. Soon thereafter, "about '42 ... and the early part of '43," he

---

[*] Associate Judge Schwelb concurs in the result and in all of Judge Terry's opinion for the court except footnote 10 and the characterization of Dr. Eliasson's testimony on page 1383.

[**] Former Chief Judge Rogers was a member of the division that heard oral argument in this case. After her departure from the court, Judge King was selected by lot to replace her.

1. The husbands alleged that they had suffered physical injuries and had contracted various illnesses and diseases as a result of their exposure to appellees' asbestos products. The wives, on the other hand, sought damages for loss of consortium, not for any direct physical injury to themselves.

worked at Walter Reed Army Hospital welding pipe in the steam tunnels. Claytor was not continuously on the jobsite at Walter Reed; rather, there would be short stints, a week at most, when he went to the hospital to repair pipes.

Some time later, when Claytor was in the Navy, he used "block" to insulate boilers, but he could not recall if it was "Kaylo block." [2] After his discharge from the Navy, Claytor returned to Acme Welding, where he remained until 1964. During his years with Acme, he said, he worked on several jobsites, including Fort Belvoir, Virginia, Fort Holabird, Maryland, and "a whole lot of different apartment houses in Washington.... I'll be darned if I know all the places where I worked." Referring to Fort Belvoir, Claytor said, "I know I worked there in '51, and I did some work there in '55. And then off and on at different times up until 1973, just different times." As to the nature of the work he performed at Fort Belvoir, Claytor testified that, among other things, he helped to tear out old pipes and boilers. He said that he, along with others, sometimes tore out old asbestos from around the pipes, but he did not know the brand name or the manufacturer of the asbestos covering (although he did recall the company—Rick–Weld Corporation—that made the pipe itself; "it had Rick–Weld marked on it").

Claytor otherwise testified only in general terms about his presence near asbestos products. He said that at times he would be inside a building when asbestos was being used, although, because he was a welder, he mainly worked outside the buildings on pipes that were connected to manholes. Claytor stated that at various times during the " '50's, '60's, and '70's" he worked at different facilities of the Chesapeake and Potomac Telephone Company, but he "never did a whole lot of work for them," usually no more than a week at a time. Sometime "in the '60's," he said, at "two or three different times," he worked at Saint Elizabeths Hospi-

tal. He believed the old pipes there had asbestos on them, and perhaps the new pipes as well, but he was not there when the new ones were installed. Other than the boiler room, he could not recall where he worked at Saint Elizabeths. Finally, Claytor mentioned that he had done some work at Catholic University, but he did not say when or for how long. Concerning his possible exposure to asbestos at Catholic University, Claytor said only that he "worked in all the buildings, and all of those buildings had asbestos in them." He did not identify the manufacturers or suppliers of any asbestos products that might have been at the university.

### 2. *Keelan*

Frank Keelan, an electrician from 1947 to 1983, testified about numerous places where he worked and where he believed asbestos products were present, but only in general terms. For example, he said that he worked for Bowen Electric Company on a job at Bladensburg High School in Prince George's County, Maryland, but he could not recall the brand names or manufacturers of any asbestos products used there. He also worked at the National Institutes of Health (NIH) during the 1950's and 1960's, but he could not remember exactly when because he "moved around so much." He did recall installing some fluorescent light fixtures in 1954 in Building 10 at NIH. On that occasion he worked near the ceiling where the installers of asbestos were also working. He also remembered working at the Wonder Bread bakery sometime during 1952 and 1953.

Keelan testified about the work he performed in the 1960's and 1970's at the Goddard Space Flight Center, a facility of the National Aeronautics and Space Administration (NASA) in Greenbelt, Maryland. He said that he worked in the "main place where they had ... the rockets and all, and also we worked in the—the different offices that were—offices of people that worked there and all. And then the tracking—we worked

---

**2.** Kaylo is (or was) an insulation product made from asbestos. Appellants assert in their brief that it was manufactured by Owens–Illinois from 1943 to 1958, and by Owens–Corning from 1953 to 1973. The record, however, does not contain any evidence from either of those companies that

they manufactured or supplied a product by the name of Kaylo. In any event, whether appellants' assertion as to who made Kaylo is correct or incorrect, it does not affect the outcome of this appeal.

in the tracking station, which is a big area." Keelan then had a "short stint, maybe six months in '69 and '70, out at Calvert Cliffs," an electric power plant in Maryland near Chesapeake Bay. He testified that at Calvert Cliffs he would work in the same room with plumbers and pipe coverers, although he could not recall any particular project or job at which pipe coverers were present, and sometimes the only other persons on the jobsite were electricians. Sometime in 1968 and 1969, Keelan said, he did some work at the headquarters of the International Monetary Fund (IMF) in downtown Washington. During the time he worked there, which was "quite a while," members of many other trades were also working at that jobsite. As for manufacturers or brand names, Keelan remembered that the pipe coverers at IMF used "Georgia–Pacific, Johns–Manville— what's the other, Corning?—there is another name that goes with Corning; that's the only ones I ever remember seeing on any job, and I'm not specifying which jobs they were on. That's the only names I can ever remember that—that—in my whole career that I remembered." He added that he did not actually see the names on the products, but was "just saying the name I heard."

Later in 1968, after the IMF job, Keelan worked for a time at a printing plant for McCall's magazine, where some new printing presses were being installed. He remembered seeing pipefitters there while he was on that job. Next, Keelan testified, he worked on a new addition to Suburban Hospital in Bethesda, Maryland. At that jobsite there were carpenters, plasterers, pipe coverers, steamfitters, and sheet metal workers. Keelan said that there were probably "sprayers [of asbestos]" there as well, but he was "not going to say that [he] saw them." [3]

### 3. Turner

Chester Turner, also an electrician, testified that he began working for his father's company as a young man and remained there until 1949. At some time during this employment, he said, he worked at three bus

terminals where he believed there might have been asbestos present, as well as a United Mine Workers hospital.

Focusing on the years 1954 to 1963, when he was employed by Harrison Electrical Contractors, Turner said he worked on "a lot of . . . small jobs," such as remodeling Sears Roebuck stores and Acme supermarkets, where he believed asbestos products were used in pipe covers. In general, he could not recall which of the many Acme stores he worked in, but he did remember one Acme store in Fort Hunt, Virginia, and two in the District of Columbia, one in Northeast Washington and another on Georgia Avenue, Northwest. Turner said that insulators were insulating pipes, refrigeration lines, and heating lines while he was there doing electrical work, but he did not know the brand names or manufacturers of any of the asbestos products being used at any of the Acme sites. He also could not remember the names of any of the people with whom he worked on the Acme jobs. He did identify two Sears Roebuck stores in the District of Columbia where he worked during this period, one on Wisconsin Avenue and the other on Bladensburg Road. He spent about two months on each of these jobsites. Although he did not work with any asbestos products, Turner said, "it was just in the building where they [were] insulating pipes and all." The asbestos was "pre-form," and he could not recall the manufacturer of it.

During 1966 and 1967, Turner testified, he worked at the new Sears Roebuck store being built at Montgomery Mall, a large shopping mall in Bethesda, Maryland. He said that the insulators were using asbestos around the air conditioning units on the roof, and he remembered seeing bags of insulation labeled "Johns–Manville," but he could not remember any other manufacturer or brand name. Also, Turner noted that there was no spraying going on at the Sears store; instead, the insulators were using only pre-formed insulation fittings. Turner testified that he did not spend much time on the roof

---

3. Appellants' brief states that in 1956 Keelan also worked "all over the new construction" of Lansburgh's department store in Langley Park, Maryland, but there is no evidence in the record to

that effect. We note that the record does not contain Keelan's entire deposition, but only selected portions of it.

(where the air conditioners were being installed), but went there only when he needed to "connect up switch gears and do the regular electrical work." He spent the remainder of his time in other parts of the building, "running electrical conduits and installing fixtures and switch gears and switches."

From 1963 to 1974 Turner was employed by Singleton Electric Company. During that period he spent approximately two years (he could not recall the exact dates) working for Singleton at Dulles International Airport in Fairfax County, Virginia. He was a "working foreman" there, which meant that he supervised the entire project and also performed various electrical tasks in the offices, in the pipe tunnels under the main building, in terminals out on the field, and in all the restaurants. He said that he believed asbestos products were being used at Dulles, but he did not work with asbestos himself. He did, however, see other workers taking preformed insulation out of "Owens–Corning" boxes. Turner also testified that "sometime between '63 and '74" he worked at one of the two Department of Agriculture buildings in downtown Washington. Asbestos products were being used there, but he only remembered insulation in "Johns–Manville" boxes.

Turner also worked for a period of time at Catholic University Law School, but he could not recall the manufacturer or brand name of any asbestos product that was used there. In addition, he said that he worked on another building at Catholic University, but he did not know whether there were any asbestos products on that jobsite. In 1971 he worked at a Safeway Stores milk plant in Landover, Maryland, where he believed there were asbestos products in the pipe covering in the hung ceiling. He was present when the old asbestos was being torn out and new insulation was being put in, but he could not recall any manufacturer or brand name of any asbestos product.

Sometime around 1973 Turner worked for about a year on two consecutive jobs at NASA's Goddard Space Flight Center. On the first job, he could not remember which building he worked in, but he knew that asbestos was present because steamfitters were tearing out old pipes and installing new

ones, and he worked "shoulder to shoulder" with the steamfitters. The pipe coverers working on the new pipes were using a preformed Owens–Corning product. He then did some work in the powerhouse at Goddard for about four months, connecting an air conditioning unit. He could not remember the brand name or the manufacturer of the asbestos product that was being used to insulate the new unit.

Turner also testified that he worked at NIH, at the Bethesda Naval Hospital, and at Prince George's Hospital Center in the late 1960's, and that he believed asbestos products were being used at each of these jobsites. However, he could not recall the manufacturers or brand names of any of these products. He also remembered working at Children's Hospital in the District of Columbia, but he had no recollection whatever of the time period. He did recall seeing boxes of Kentile asbestos tile on the floor while he was at Children's Hospital, but his exposure to the product was limited to those times when he would walk from floor to floor.

Finally, Turner testified that he did some work at the White House at about the time of the Cuban missile crisis in the fall of 1962, but he did not think any asbestos products were being used at that time. Several years later, when the press room was relocated during the Nixon administration, Turner worked once again at the White House for about eleven months. During that time, he said, he worked around steamfitters and plumbers who were using asbestos products manufactured by Owens–Corning. He testified that "everyone" was working in the same room and that he was in the vicinity of the asbestos pipe when it was being cut.

### B. *Additional Evidence*

Charles Mankin, a sheet metal worker, testified in a deposition that he worked on a project at the Catholic University Theater (no date was given for this job) and that there "possibly very well could have" been asbestos products in the building where he worked. He remembered working with products manufactured by "Owens–Corning, Pittsburgh, Cal–Temp, Armstrong, [and] BEH" at various times during his career, but

he did not specify any dates, or even any range of years, when this occurred.

Robert Stransky, an insulator, worked at Saint Elizabeths Hospital in 1957 and 1958. He stated in his deposition that the insulation came in boxes that were labeled "Philip Carey, Owens–Illinois Kaylo, and Johns–Manville." He remembered other workers—steamfitters, welders, and sprayers—also using asbestos products. He could not remember at what point members of the various trades were on the job, but he did recall that the sprayers did not come until after a room had been completed. He did not know who manufactured the spray asbestos or any of the other materials that these workers used.

In 1967 and 1968 Stransky was employed at the McCall's printing plant, where he insulated pipes. He said that the building was large, two or three floors, and he specifically recalled using Owens–Corning pipe covering there.

In 1970 and 1971 Stransky was working at NASA's Goddard Space Flight Center. He could not recall which buildings he had worked in, although he knew he had been in about three different ones. He also knew that he did not work in the building where the spacecraft parts were tested, but he did work in the administration building. He remembered seeing "GAF" and "Owens–Corning" written on the boxes of the material he used at Goddard. He did not recall any other workers on these jobs.

Carl Almgren, an insulator, stated in his deposition that sometime in the 1960's ("in the sixties is the best I can do") he worked at the International Monetary Fund building for about two months and remembered using Owens–Corning and Johns–Manville asbestos products there. He was also employed on a job at Lansburgh's department store in approximately 1956, where he worked in the boiler room and the basement. He was on that job for approximately four months and remembered using a product called Calcilite there. He thought it was manufactured by Ruberoid (a corporate predecessor of GAF).

Don Burroughs, a pipe coverer, worked at the Calvert Cliffs power plant for about four months, beginning in March of 1972. In his deposition he said that the plant was about 200 feet tall and 100 feet wide, and he estimated that there might have been as many as fifteen levels in the building. The only specific product that he could recall being used there was Unibestos pipe covering. Asbestos cloth was also used on that job, but he could not remember the name of its manufacturer.[4]

John Koutsos, an insulator, had a recollection of working for about two or three weeks at the Sears Roebuck store on Bladensburg Road in about 1959. He testified that he thought he worked with Kaylo, manufactured by Owens–Corning.

Finally, appellants submitted excerpts from the depositions of Orn Eliasson, M.D., and William J. Nicholson, Ph.D., as well as an affidavit from Dr. Eliasson. Dr. Nicholson testified about the "fiber drift theory." He said that fibers from asbestos remain aloft and can spread to other areas, although he acknowledged that the "exposure, of course, is much greater if one works in proximity to where the workers are directly using the asbestos materials or removing them."

Dr. Eliasson testified that asbestos-related diseases do not appear until after "significant exposure and significant amount of period—or significant number of years." He added that there is "generally a dosage response relationship" in cases of asbestos-related lung disease. In his affidavit Dr. Eliasson stated, "My experience and study lead me to the conclusion that any exposure to asbestos fibers is unsafe and medically significant and there are no 'safe levels.'"

## II

Rule 56(c) of the Superior Court Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

4. An insulator named David Thomas also provided testimony about Calvert Cliffs. He stated that he worked there from December 1970 to August 1971 and used Unibestos, a product which he said was manufactured by Pittsburgh Corning.

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), a leading case involving the corresponding federal rule,[5] the Supreme Court declared that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." This court, in reviewing a trial court order granting summary judgment, must conduct its own independent review of the record to determine whether there is a genuine issue of material fact to be tried. *E.g., Bolle v. Hume*, 619 A.2d 1192, 1194–1195 (D.C.1993); *Graff v. Malawer*, *supra* note 5, 592 A.2d at 1040; *Sayan v. Riggs National Bank*, 544 A.2d 267, 268 (D.C.1988); *Spellman v. American Security Bank*, 504 A.2d 1119, 1122 (D.C.1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson, supra*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ Once the movant has made an initial showing that there is no genuine issue of material fact, the non-moving party then has the burden to show that an issue does exist. *Landow v. Georgetown–Inland West Corp.*, 454 A.2d 310, 313 (D.C.1982). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson, supra*, 477 U.S. at 252, 106 S.Ct. at 2512.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue of material fact," since a complete failure of

proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The trial court in the present case was satisfied with appellees' initial showing that appellants lacked sufficient evidence to support their claims. The burden then shifted to appellants to demonstrate to the court that there was a genuine issue with respect to causation so that appellees would not be entitled to judgment as a matter of law. *See Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C.1991). Our review of the record leads us to agree with the trial court that, with one small exception,[6] appellants failed to offer sufficient evidence to meet the standard articulated in *Anderson, Celotex*, and many similar cases.

### A. The Law of Causation

■ In their several motions for summary judgment, appellees asserted that appellants had failed to produce any evidence that appellees' products were the proximate cause of their asbestos-related illnesses. It is, of course, incumbent on the plaintiff in any product liability action to show that the defendant's product was the cause of his or her injuries. Although causation issues have not previously been addressed by this court in any asbestos-related case, we see no reason to depart from our generally applicable standards for proving proximate cause.

■ In 1972, in *District of Columbia v. Frick*, 291 A.2d 83, 84 (D.C.1972), this court adopted the proximate cause standard set forth in the RESTATEMENT (SECOND) OF TORTS § 431 (1965). Section 431 states:

> The actor's negligent conduct is a legal cause of harm to another if
>
> (a) his conduct is a *substantial factor* in bringing about the harm, and

---

5. Because the Superior Court rule is identical to its federal counterpart, FED.R.CIV.P. 56, this court in interpreting the local rule has often relied on federal court decisions interpreting the federal rule. *See, e.g., Graff v. Malawer*, 592 A.2d 1038, 1040–1041 (D.C.1991).

6. As we said earlier, appellant Turner has provided sufficient evidence to raise an issue as to whether products manufactured by Owens–Corning were a proximate cause of his injuries.

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm. [Emphasis added.]

Legal cause, otherwise known as proximate cause, has two elements: "a cause-in-fact . . . element and a policy element." *Lacy v. District of Columbia*, 424 A.2d 317, 320 (D.C. 1980) (footnote omitted).[7] Thus a defendant cannot be held liable unless that defendant has in fact caused the plaintiff's harm, and then only if certain "liability-limiting considerations which relieve the defendant of liability for the harm he actually caused" are not applicable. *Id.* at 320–321. Although it is often said that proximate cause is an issue for the jury,[8] it can also be a question of law for the court to consider in the first instance, before the case even goes to the jury. *See* J.D. Lee & B.A. Linahl, Modern Tort Law § 4.05 (Rev.Ed.1988). If there is insufficient evidence for a reasonable jury to find that the defendant's conduct caused harm to the plaintiff, the court must direct a verdict for the defendant. *See District of Columbia v. Freeman, supra* note 8, 477 A.2d at 716 (the question "becomes one of law . . . when the evidence . . . will not support a rational finding of proximate cause"). In addition, if the court determines that a certain "chain of events appears highly extraordinary in retrospect," the case should also be taken from the jury. *Lacy, supra,* 424 A.2d at 321 (citation and internal quotation marks omitted).

Several courts faced with the issue of causation in asbestos-related cases have employed the Restatement's "substantial factor" test.[9] In 1986, however, in *Lohrmann v. Pittsburgh Corning Corp., supra,* the Fourth Circuit formulated a "frequency, regularity, and proximity" test in determining whether a specific asbestos product contributed to, or was a substantial cause of, the plaintiff's

injuries. The plaintiff, having gone to trial against seven manufacturers of asbestos products, had argued that if he could present

> any evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace, a jury question has been established as to whether that product contributed as a proximate cause to the plaintiff's disease.

782 F.2d at 1162. The Court of Appeals, rejecting this argument, held instead that whether a plaintiff claiming an asbestos-related injury could get to the jury (or defeat a motion for summary judgment) "would depend upon the frequency of the use of the product and the regularity or extent of the plaintiff's employment in proximity thereto." *Id.*

■ The trial court in this case relied in large part on *Lohrmann* in granting summary judgment for appellees, and appellees urge us to do likewise. But because this court "reviews summary judgment *de novo*," *Kendrick v. Fox Television,* 659 A.2d 814, 818 (D.C.1995) (citation omitted), we need not follow the same legal theory as the trial court in order to affirm its ruling. Thus this court need not decide whether to adopt a new, asbestos-specific test based on *Lohrmann* because, under the existing District of Columbia law found in such cases as *Frick* and *Lacy,* the result in this case would be the same as it would be under *Lohrmann.* Moreover, there can be no doubt that both *Lohrmann* and our own case law are derived from the same source, section 431 of the Restatement. *See Lohrmann, supra,* 782 F.2d at 1162; *Frick, supra,* 291 A.2d at 84. *Lohrmann* makes clear that its specialized test for asbestos cases is merely an elaboration of the Restatement's "substantial factor" test applicable to any determination of proximate cause. 782 F.2d at 1162.

---

**7.** The omitted footnote cites both section 431 of the Restatement and the Reporter's Note to section 433, which draws the distinction (recognized in *Lacy*) between "causation in fact" and a "legal policy" which may relieve the defendant of liability even though the defendant has, as a matter of fact, caused the harm.

**8.** *E.g., District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C.1984).

**9.** This court declared in *Lacy* that "[t]he substantial factor test [is] the best means of resolving the causation in fact issue," 424 A.2d at 321, and that "the substantial factor test is properly applicable whenever there are concurring causes of a single injury. . . ." *Id.* at 322. We specifically rejected the assertion that the substantial factor test was limited to medical malpractice cases. "There is no logical reason to draw such a limitation. . . ." *Id.*

In seeking reversal and a remand for trial, appellants focus on the statement in Dr. Eliasson's affidavit that "any exposure to asbestos fibers is unsafe and medically significant." We must read this statement, however, in the context of Dr. Eliasson's deposition testimony that asbestos-related diseases do not appear until after "significant exposure and significant amount of period—or significant number of years." Thus Dr. Eliasson admits that even though "any exposure" is "unsafe," the development of asbestos-related *disease*—which is the gravamen of appellants' complaint—requires "significant exposure" and a "significant number of years." In any event, neither Dr. Eliasson's affidavit nor his deposition testimony can alter the legal principle that "an essential element of the plaintiff's case [is] the identification of the named defendant as the manufacturer or supplier of the defective product." W. PAGE KEETON, *et al.*, PROSSER AND KEETON ON THE LAW OF TORTS § 103, at 713 (5th ed. 1984) (footnote omitted); *see District of Columbia v. Frick, supra,* 291 A.2d at 84 (plaintiff must prove "a reasonable causal connection between the act or omission *of the defendant* and the plaintiff's injury" (emphasis added)); RESTATEMENT (SECOND) OF TORTS § 433B(1)

(1965) ("the burden of proof that the tortious conduct *of the defendant* has caused the harm to the plaintiff is upon the plaintiff" (emphasis added)). Thus appellants must identify and prove which manufacturers of allegedly hazardous products caused their injuries.[10]

■ Dr. Nicholson's deposition testimony about fiber drift does not alter our conclusion. The gist of the fiber drift theory is that asbestos fibers, once released, may remain aloft for significant periods of time and may even travel as far as half a mile through the air. Nevertheless, it still remains the law in the District of Columbia that a plaintiff suing in tort must prove causation, *Frick, supra,* 291 A.2d at 84; *see Lacy, supra,* 424 A.2d at 321, and thus, in a product liability case, must identify the manufacturer or distributor of the particular product which caused, or was a substantial cause of, his or her injury.

■ When the Third Circuit, in applying Pennsylvania law which included the "frequency, regularity, and proximity" standard, was confronted with the fiber drift theory, it declared:

10. If we were to require less, we would be headed down the road toward a theory of "market share" liability, which would effectively abolish the common law cause-in-fact requirement. The market share theory has given rise to an abundance of law review articles, and the concept has been addressed by several courts. There appears to be no disagreement that it represents a "radical departure[] from traditional theories of tort liability." *Thompson v. Johns–Manville Sales Corp.,* 714 F.2d 581, 583 (5th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); *see* Kenneth S. Abraham, *What Is a Tort Claim? An Interpretation of Contemporary Tort Reform,* 51 MD.L.REV. 172, 183–184 (1992).

We are not called upon here to decide whether to adopt the concept of market share liability (although there was some discussion of it at oral argument), but we note that it has been generally rejected by courts in other jurisdictions. *See* Andrew B. Nace, Note, *Exclusion of Personal Injury Damages: Have the Courts Gone Too Far?,* 44 VAND.L.REV. 369, 412–415 (1991) (noting criticisms of the market share theory and pointing out that courts have generally refused to extend it to asbestos victims). Even those courts which accept it have restricted the imposition of market share liability to cases involving the drug diethyl-

stilbestrol (DES). *See Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 610–611, 163 Cal.Rptr. 132, 144, 607 P.2d 924, 936 (adopting market share liability in DES case), *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 286, 66 L.Ed.2d 140 (1980); *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.S.2d 487, 511–512, 541 N.Y.S.2d 941, 950, 539 N.E.2d 1069, 1078 (adopting a variation of market share liability in DES case), *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 337 (1989); *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 602–05, 689 P.2d 368, 381–382 (1984) (same); *Collins v. Eli Lilly & Co.,* 116 Wis.2d 166, 190–91, 342 N.W.2d 37, 49 (same), *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). *Contra, Mulcahy v. Eli Lilly & Co.,* 386 N.W.2d 67, 75–76 (Iowa 1986) (refusing to modify common law doctrine in DES case); *Zafft v. Eli Lilly & Co.,* 676 S.W.2d 241, 244–246 (Mo.1984) (same). We have found no case involving a product other than DES in which market share liability has been imposed. In cases involving asbestos, moreover, there are practical problems with applying the concept, problems that are inherent in the nature of asbestos itself, which comes in many forms and is used in several different ways. *See Mullen v. Armstrong World Industries, Inc.,* 200 Cal.App.3d 250, 257, 246 Cal.Rptr. 32, 37 (1988); *Goldman v. Johns–Manville Sales Corp.,* 33 Ohio St.3d 40, 50–51, 514 N.E.2d 691, 700–701 (1987).

The fiber drift theory cannot stand alone; it must be supported by evidence showing the frequency of a product's use and the regularity of the plaintiff's employment in an area into which there is a reasonable probability that the fibers drifted.

*Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 380 (3d Cir.1990). Other courts have rejected the fiber drift theory outright, stating, for example, that "it is inconsistent with the requirement ... that an actor's negligence be a substantial factor in causing the injury." *Eagle–Picher Industries, Inc. v. Balbos*, 326 Md. 179, 217, 604 A.2d 445, 463 (1992). The Maryland Court of Appeals ruled in *Eagle–Picher* that evidence of "causation in fact under the 'fiber drift theory'" was so "extremely attenuated" that it was insufficient as a matter of law to impose liability. *Id.* The *Robertson* court did not go so far. It acknowledged that "the fiber drift theory may be useful in extending the zone of proximity," but it also made clear that the fiber drift theory could not, "standing alone, allow a plaintiff to circumvent the other requirements of [the frequency, regularity, and proximity test]." 914 F.2d at 383. We need not decide whether to follow *Robertson* or the more exacting holding of such cases as *Eagle–Picher* because, even under the more lenient *Robertson* standard, the fiber drift theory will not support the imposition of liability on a particular defendant without at least some showing that the products *of that defendant* were responsible for the plaintiff's injuries.

The remaining question to be answered here is whether the individual appellants offered sufficient evidence of their own exposure to appellees' products to withstand the summary judgment motions. To that question we now turn our attention.

### B. *The Evidence of Causation in This Case*

There is no doubt that appellants have formidable evidentiary problems in trying to connect these particular appellees to the asbestos products which may have caused their injuries. We conclude, on the record before us, that the judgments against appellants Claytor and Keelan must be affirmed. The evidence presented by these two claimants

"is merely colorable, [and] is not significantly probative," *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 249–250, 106 S.Ct. at 2511 (citations omitted), and thus summary judgment was properly entered against them. Turner's position is somewhat stronger, at least as to one manufacturer. Although we affirm the judgment against him on his claim against GAF, we find in the record sufficient evidence to raise a jury issue as to whether products manufactured by Owens–Corning Fiberglas Corporation were a substantial causative factor in his injuries.

We emphasize that we are not requiring appellants to present direct evidence of their exposure to specific asbestos products, or testimony from others who could verify appellants' presence during the use of specific asbestos products, because we agree that "[s]uch burden is unreasonable." *Roehling v. National Gypsum Co. Gold Bond Bldg. Products*, 786 F.2d 1225, 1228 (4th Cir.1986). Appellants may prove their case, specifically the element of causation, by circumstantial evidence, deriving the benefits of all reasonable inferences. It is the duty of the court, however, "to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.1958), *cert. denied*, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958), quoted with approval in *Lohrmann*, *supra*, 782 F.2d at 1163. Appellants Claytor and Keelan attempt to raise genuine issues of material fact by offering statements from persons who identify certain asbestos products that were present in the general vicinity where Claytor and Keelan, at some time, may also have been present. That is not enough. A mere showing that appellants worked at jobsites where appellees' asbestos products were used at some point will not give rise to an inference, sufficient to defeat summary judgment, that appellants themselves may have been exposed to those products. *See, e.g., Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1481 (11th Cir.1985); *Eagle–Picher, supra*, 326 Md. at 214–217, 604 A.2d at 462–463. What is minimally required, and what Claytor and Keelan failed to present, is proof that

appellants and the defendants' products were in the same place at the same time.[11]

■ Claytor testified that he worked on automobiles at Acme Welding between 1938 and 1942 using wet asbestos, but there was no evidence of who manufactured this asbestos. The same failure to identify a manufacturer characterizes virtually all of Claytor's testimony; there is no evidence identifying any asbestos product used or encountered at any jobsite where he worked, except for one reference to the manufacturer of the asbestos-covered pipe used at Fort Belvoir. Significantly, this testimony identified only the maker of the pipe itself (Rick-Weld), not the maker of the asbestos product from which the pipe covering was made. Moreover, Claytor referred only to entire decades during which, at some point, he worked at a jobsite where asbestos products might have been present; for example, he said that he worked at Saint Elizabeths Hospital "in the '60's ... at two or three different times." He also testified that he was exposed to asbestos at Catholic University because "all the buildings had asbestos in them," but he did not say when or how long he worked at Catholic University—and of course he did not identify any of the asbestos products that were in "all the buildings."

The depositions of Charles Mankin and Robert Stransky add nothing to Claytor's case. Mankin, who worked on the Catholic University Theater, was far from positive that asbestos products were being used while he was there. Although he did recall the name "Owens–Corning" associated with some products with which he worked at Catholic University, he never said when he was there, not even in the vaguest terms. Stransky's testimony was similarly unhelpful. He was an insulator who worked at Saint Elizabeths Hospital in 1957 and 1958 and recalled seeing boxes there labeled "Owens–Illinois Kaylo." Claytor, however, testified that he worked at Saint Elizabeths two or three times during the 1960's, significantly later than the time when Stransky saw those boxes. Even viewing the record in the light most favorable to Claytor, we cannot find any evidence which would permit a jury to draw a reasonable inference that asbestos products manufactured by any of the appellees had a causative role in his injuries.

■ Keelan's evidence is no better than Claytor's. Keelan offered testimony that he was present at numerous jobsites where he believed asbestos products were used. Fatal to his cause, however, is his failure to specify the dates when he was present at any of these sites when asbestos made by any appellee was in use. Robert Stransky's deposition testimony is of no help to Keelan either. Stransky, an insulator who used asbestos, stated that he worked at NASA's Goddard Space Flight Center in 1970 and 1971. He remembered working in three different buildings there (although he did not know which ones they were), and he also recalled seeing boxes with "Owens–Corning" and "GAF" written on the side. However, Stransky did not remember what other types of workers (e.g., electricians) were on these jobs. Keelan's only connection with the Goddard Space Flight Center was his statement that he worked there as an electrician in the 1960's and 1970's. This was not enough to prove that Keelan worked anywhere near Stransky, and certainly not enough to put Keelan in the vicinity of any Owens–Corning or GAF products. Faced with this meager proof, any reasonable juror would have to take a huge—and impermissible—speculative leap to find that Owens–Corning and GAF products had any causal connection with Keelan's injuries.

■ Keelan's other evidence also fails even to raise an issue as to proximate cause. While Keelan said he was present at the International Monetary Fund headquarters sometime in 1968 and 1969, Carl Amlgren, an insulator, could only recall using Owens–Corning asbestos products at the IMF sometime in the 1960's, and then only for about

---

11. The weakness of Claytor's and Keelan's claims is also shown by their inability to specify any reasonably exact period of time when both they and the products were present in the same place. The decade approach used by appellants, e.g., "I worked there sometime in the 60's and 70's," while understandable after the passage of years, is nevertheless wholly inadequate to defeat appellees' summary judgment motions.

two months. Keelan testified that he worked at the McCall's printing plant at some point in 1968, and Stransky recalled using Owens–Corning asbestos products there in 1967 and 1968. Further testimony, however, revealed that the McCall's plant was a large building with two or three floors, and there was no other evidence placing Keelan and Stransky anywhere near each other.[12] Given the size of the plant and the broad time span, no trier of fact could reasonably find a causal connection between any Owens–Corning product and Keelan's injuries.

Finally, Keelan testified that asbestos products were being used at the Calvert Cliffs power plant when he worked there for "a short stint, maybe six months" in 1969 and 1970. A pipe coverer named Don Burroughs testified as to his own use of Unibestos, a Pittsburgh Corning product, at Calvert Cliffs, but he was there only for about four months in 1972. Similarly, David Thomas said that he worked with Unibestos while he was employed as an insulator at Calvert Cliffs. He was there, however, from December 1970 to August 1971. There is nothing in the testimony of either Burroughs or Thomas that would permit a trier of fact to identify the asbestos that Keelan saw at Calvert Cliffs in 1969 or early 1970[13] as a Pittsburgh

Corning product, and thus no basis for any imposition of liability on Pittsburgh Corning.

In most respects Turner is in the same situation as Claytor and Keelan. Almost all of Turner's evidence is insufficient to show the frequency of his exposure and the regularity of his employment in an area where asbestos products were being used. For example, Turner recalled working at Catholic University at some unspecified time, but he provided almost no further information as to dates or buildings[14] on a multi-building campus. Charles Mankin, the only other witness who worked at Catholic University, also failed to specify the dates when he was there and could identify only one building in which he worked where asbestos products "possibly very well could have" been in use. Likewise, while Turner testified that he worked at various places where asbestos products were being used, he was almost totally unable to identify any manufacturers or brand names.[15]

Turner's case is significantly stronger, however, with regard to his exposure to asbestos at the White House. He testified that during a period of eleven months he worked in the same room—"everyone" was working in the same room—where asbestos pipes were being cut, and he specifically identified the manufacturer of those products

12. We emphasize that Keelan, an electrician, was not a direct user of asbestos (as an insulator would be, for example) but a mere bystander. Thus an understanding of the physical layout of a particular workplace is essential to any determination that a bystander, as opposed to a direct user, was exposed to the asbestos product of a specific manufacturer and that that product was a substantial factor in causing the bystander's injury. See Eagle–Picher, supra, 326 Md. at 209–211, 604 A.2d at 460.

13. Even if we assume that Keelan's "six months in '69 and '70" at Calvert Cliffs consisted of only one day in 1969 and all the rest in 1970, he would have left Calvert Cliffs no later than June 30, 1970, several months before Thomas started working there.

14. Turner did remember that he had done some work at the Catholic University Law School, but he could not identify the manufacturer or brand name of any asbestos product used at that jobsite.

15. For example, Turner recalled working at two different Sears Roebuck stores, one of which was on Bladensburg Road, between 1954 and 1963.

John Koustas, an insulator who used Owens–Corning asbestos products, said that he worked at the Bladensburg Road store sometime around 1959, but only for two or three weeks. This testimony is patently insufficient to raise a material issue as to whether any Owens–Corning products at this site were a substantial factor in causing Turner's injuries.

Turner also testified that he worked for a period of time at Dulles International Airport, where insulators used Owens–Corning asbestos products. But there is no evidence that Turner was regularly exposed, or exposed at all, to Owens–Corning asbestos products at Dulles Airport. The time span given by Turner is too great to permit any inference, let alone a reasonable inference, that Owens–Corning products in use at the airport were a substantial factor in causing his injuries. Even assuming that the fiber drift theory lessens a plaintiff's burden of proof to some extent, there is no evidence of the size of the area where the asbestos was used and none showing whether that area was ventilated or enclosed.

as Owens–Corning. This testimony may or may not persuade a jury to return a favorable verdict, but it is at least sufficient to raise a material issue of fact as to whether Turner's exposure to Owens–Corning products was a substantial factor in causing his injuries.

In addition, Turner testified that for several months in 1973 or thereabouts he worked "shoulder to shoulder" with steamfitters who were installing asbestos products at the Goddard Space Flight Center. He remembered "seeing Owens–Corning [pipe insulation] on that job," where "everybody was working in the same big open area." We need not decide whether this evidence, standing alone, would suffice to prove causation. Because the standard set forth in section 431 of the Restatement is clearly met by the evidence of Turner's exposure to Owens–Corning products at the White House, and because Owens–Corning was also the manufacturer of the products in use at the Goddard Space Flight Center, in close proximity to where Turner was working, we conclude that the Goddard evidence may be considered along with the White House evidence in any trial of Turner's claim against Owens–Corning.

### III

We therefore hold that summary judgment was properly entered against appellants Claytor and Keelan. Their claims must fail because they never established, at a minimum, that they and the appellees' asbestos products were ever in the same place at the same time. The same can be said, for the most part, about appellant Turner as well. However, because the Turners have presented sufficient evidence to raise a material issue as to whether products made by Owens–Corning might have caused Mr. Turner's injuries, we hold that the trial court erred in granting summary judgment in favor of Owens–Corning on the Turner claim. We therefore reverse the judgment for Owens–Corning against Mr. and Mrs. Turner and remand the case for further proceedings on the Turners' claim against Owens–Corning. In all other respects the judgment of the trial court is affirmed.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

Separate statement of Associate Judge TERRY:

Having written the opinion for the court, I take this unusual step of writing an additional statement because I think the court should go ahead and adopt the test for asbestos cases articulated by the Fourth Circuit in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986). My colleagues see no need to go that far, but I see no harm in it, so I add these observations.

Since *Lohrmann* was decided in 1986, its "frequency, regularity, and proximity" test has been adopted by many other courts, in whole or in substantial part, in determining whether a specific asbestos product contributed to, or was a substantial cause of, a plaintiff's injuries. *E.g., Rotondo v. Keene Corp.*, 956 F.2d 436, 440 (3d Cir.1992) (applying Pennsylvania law); *Menne v. Celotex Corp.*, 861 F.2d 1453, 1463–1464 (10th Cir. 1988) (applying Nebraska law); *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482–1483 (11th Cir.1985) (applying Georgia law); *Tragarz v. Keene Corp.*, 734 F.Supp. 834, 836–837 (N.D.Ill.1990) (applying Illinois law); *Roberts v. Owens–Corning Fiberglas Corp.*, 726 F.Supp. 172, 174 (W.D.Mich.1989); *Zimmer v. Celotex Corp.*, 192 Ill.App.3d 1088, 1091–1092, 140 Ill.Dec. 230, 233, 549 N.E.2d 881, 884 (1989); *Eagle–Picher Industries, Inc. v. Balbos*, 326 Md. 179, 209–211, 604 A.2d 445, 460 (1992); *O'Connor v. Raymark Industries, Inc.*, 401 Mass. 586, 518 N.E.2d 510 (1988); *Sholtis v. American Cyanamid Co.*, 238 N.J.Super. 8, 28–29, 568 A.2d 1196, 1207 (1989); *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 190–191, 544 A.2d 50, 52–53, *allocatur denied*, 520 Pa. 605, 553 A.2d 968 (1988). In *Lohrmann* the court expressly rejected the plaintiff's argument that if he could "present any evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace, a jury question [would be] established as to whether that product contributed as a proximate cause to the plaintiff's disease." 782 F.2d at 1162. Instead, the court held:

To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of *exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.*

*Id.* at 1162–1163 (emphasis added).

Appellants assert that *Lohrmann,* in which a directed verdict for the defendants was affirmed because of the plaintiff's failure to prove causation, is distinguishable from the case at bar. They contend that the decision in *Lohrmann* turned on the testimony of the plaintiff's medical expert, who expressed the opinion that "even thirty days' exposure, more or less, was insignificant as a causal factor in producing plaintiff's disease." *Id.* at 1163. I do not read *Lohrmann* so narrowly.

The court's reference in *Lohrmann* to the expert testimony was merely intended to highlight the weakness of the plaintiff's case, for it was established by other evidence that the plaintiff had worked for thirty-nine years at the particular shipyard where he claimed to have been continuously exposed to asbestos products. Clearly, the expert's requirement of more than thirty days of exposure was insignificant against the backdrop of the plaintiff's thirty-nine-year career in a single workplace. The insufficiency of the plaintiff's proof in *Lohrmann* resulted not from any shortcoming in the expert's testimony but, rather, from the plaintiff's inability to identify the particular asbestos products to which he was exposed while he worked at the shipyard. As a matter of substantive law, the *Lohrmann* court held that, in order to establish proximate cause, "the plaintiff must introduce evidence which allows the jury to reasonably conclude that it is more likely than not that the conduct *of the defendant* was a *substantial factor* in bringing about the result. . . . This is the standard set forth in the Restatement (Second) of Torts § 431 . . . ." *Id.* at 1162 (citation omitted; emphasis added). Applying this standard to the established facts, the court noted that "when one considers the size of a workplace such as Key Highway Shipyard, the mere proof that the plaintiff and a certain asbestos

product are at the shipyard at the same time, without more, does not prove exposure to that product." *Id.* Thus, in affirming the trial court's ruling that the plaintiff had not proved a reasonable likelihood that his illness was caused by the defendants' products, the court in *Lohrmann* concluded that the trial judge's "use of the 'frequency, regularity, and proximity test' was appropriate in determining whether the inferences raised by the testimony were within the range of reasonable probability so as to connect a defendant's product to the plaintiff's disease process." *Id.* Simply stated, the plaintiff had failed to prove "exposure to a specific product on a regular basis over some extended period of time in proximity to where [he] actually worked." *Id.* at 1162–1163.

Because the *Lohrmann* rule is entirely consistent with long-established case law in the District of Columbia, I would have no difficulty in accepting it for use in asbestos-related litigation. The trend throughout the country appears to be toward adopting *Lohrmann,* and I see no reason for this court to hold back.