*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 20-CF-221

GABRIEL SANCHEZ, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF1-001326)

(Hon. Juliet J. McKenna, Trial Judge)

(Submitted September 21, 2022                    Decided January 19, 2023)

*Cecily E. Baskir* was on the brief for appellant.

*Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Raymond Hulser*, *Sitara Witanachchi*, and *David B. Goodhand*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellant Gabriel Sanchez was convicted of

assaultive offenses, weapons offenses, and obstruction of justice, all arising from the

shooting of Wuilian Cruz.  We affirm in part, vacate in part, and remand in part.

## I.  Factual Background

The evidence at trial was as follows.  Just before the shooting, Francisco Rosales was driving on Connecticut Avenue NW near Dupont Circle in Washington, D.C., with his friend Mr. Cruz in the passenger seat.  As the car drove slowly along the street, Mr. Rosales noticed two men and a group of women looking or staring at the car.  One of the men appeared to be light-skinned, clean-shaven, and Hispanic, and was wearing a black shirt.  That man stepped off the sidewalk, walked on the road toward the driver-side door of a parked car (later determined to be Mr. Sanchez's Honda Accord) and approached the passenger side of Mr. Rosales's car, which was moving at that point.  A witness testified that security footage from a nearby jewelry store showed a man wearing a black shirt and black hat reach down into the parked Honda Accord and look toward the street as Mr. Rosales's car approached.  According to Mr. Rosales, the man in the black shirt said something to Mr. Cruz and then shot Mr. Cruz.  Mr. Cruz survived but lost an eye.

Earlier that evening, Mr. Sanchez parked his dark gray Honda Accord in the 1300 block of Connecticut Avenue NW.  After a few minutes, a man later identified

as Mr. Sanchez was captured on security footage emerging from the car, accompanied by several others. Mr. Sanchez was wearing a black short-sleeved shirt and a black baseball hat. A parking ticket the Honda received that evening indicated that the car was registered to Mr. Sanchez.

The day after the shooting, Mr. Sanchez traded in his Honda Accord for a Honda Pilot. While at the Honda dealership, Mr. Sanchez, who had a new phone, threw his old phone on the ground, used a hammer to "smash up" the old phone, and threw the old phone into a dumpster. Mr. Sanchez did that in the presence of a salesperson at the dealership, Michael Mulcahy, with whom Mr. Sanchez was friendly. After Mr. Sanchez discarded his old phone, Mr. Sanchez's demeanor changed and he said that "the car was hot" and that "he was in some shit." Mr. Sanchez later expressed concern that some other dealership patrons might be "feds." After initially expressing some hesitancy about speaking with detectives, Mr. Mulcahy eventually spoke with law enforcement about his observations of Mr. Sanchez. Mr. Sanchez thereafter called Mr. Mulcahy several times in an effort to keep tabs on the investigation. When Mr. Mulcahy ultimately disclosed that he had received a subpoena to appear before a grand jury, Mr. Sanchez asked Mr. Mulcahy not to say that he had seen Mr. Sanchez breaking the phone and directed him to stick

with the story that the two men used the hammer to remove a license-plate bracket instead.

## II. Preclusion of Recross-examination

Mr. Sanchez argues that the trial court erred by denying Mr. Sanchez's request to recross-examine Mr. Rosales. We uphold the trial court's ruling.

### A. Procedural Background

During direct examination, Mr. Rosales testified that as he drove away immediately after Mr. Cruz was shot, he saw the man who shot Mr. Cruz just standing there staring at Mr. Rosales's car. Mr. Rosales further testified that he saw the same individual reaching into a parked car as Mr. Rosales and Mr. Cruz approached, but he did not see anything in the individual's hand. On cross-examination, after Mr. Rosales reaffirmed that he had not seen anything in the individual's hand, Mr. Rosales and defense counsel engaged in the following exchange:

Q:     And you didn't see a hand being raised, right?

A:     I was never asked that, sir.

Q:     Well, you testified in the grand jury before; is that right?

A:     Right, yes.

Q:     And in the grand jury, you said that the guy that you saw was just standing there in the street with his hands by his side; is that correct?

A:     Yes.  After the—

Q:     Well, no, I'm asking you beforehand.  You were asked, grand jury, page 18, line 6: Did you see the gun?  And your answer was: I mean, no.  Because there is—when we—when we first just got to him, he didn't have his hand raised or nothing.  His hands were just at a normal posture.  A normal posture meaning down, right?

A:     Uh-huh.

Q:     Right.  So beforehand you never saw any hands raised; is that right?

A:     Beforehand?

Q:     Before you heard a shot, you didn't see a gun?

A:     No.

Q:     You just saw a guy with his hands down, right?

A:     Before the shot, no, I didn't see no gun.

In response to subsequent questioning by defense counsel, Mr. Rosales reaffirmed that the individual was "standing there" before the shooting and after the shooting. Defense counsel did not ask where the individual's hands were after the shooting.

On redirect examination, the prosecutor asked Mr. Rosales where the individual's hands were before, during, and after Mr. Rosales and Mr. Cruz drove by. The following exchange ensued:

> Q: And as you approached—where are his hands as you approached?
>
> A: As I approached him, his hands, I believe, are by his side.
>
> Q: As you went past, did his hands—did you see his hands change positions?
>
> A: As we approached him, right next to us, I believe, he walked up to the vehicle, but I didn't see his hand gesture.
>
> Q: Did you see a hand gesture at any time as you went past?
>
> A: When I went past after Wuilian got shot, yeah, I seen him lower his arm, but I didn't see nothing else. I just seen his face.

Defense counsel sought to recross-examine Mr. Rosales, arguing that the "lowered arm" comment came out for the first time on cross-examination. Concluding that Mr. Rosales's grand-jury testimony had sufficiently impeached Mr. Rosales on that point, the trial court did not allow defense counsel to recross-examine Mr. Rosales.

## B. Standard of Review and Legal Background

After the government's case in chief, defense counsel is "given the opportunity to cross-examine the government's witnesses about those matters that are raised by the direct examination . . . . At the conclusion of cross-examination, the government can request an opportunity for redirect examination, which is usually restricted by the scope of cross-examination . . . ." *Green v. United States*, 209 A.3d 738, 741 (D.C. 2019) (citations and internal quotation marks omitted). Although the Sixth Amendment provides the defendant with a right to cross-examination, "[t]here is . . . generally no constitutional right to recross-examine a witness." *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C. 1978). "In the rare case in which material new matters are brought out on redirect examination," however, the Confrontation Clause of the Sixth Amendment requires that the defendant have the opportunity to recross-examine with respect to the new matters elicited on redirect examination.

*Id.* at 1073. In determining whether redirect examination brought out a new matter, we consider whether the defendant had an adequate opportunity to explore the matter at issue on cross-examination. *See Washington v. United States*, 760 A.2d 187, 195 (D.C. 2000) (concluding that trial court properly declined to allow recross-examination where "counsel had let his earlier opportunity [to ask particular question] slip by"). We review de novo whether Mr. Sanchez had a constitutional right to recross-examination in the circumstances of this case. *Green*, 209 A.3d at 742.

## C. Analysis

For two principal reasons, we conclude that Mr. Sanchez did not have a constitutional right to recross-examination. First, Mr. Sanchez cross-examined Mr. Rosales extensively about Mr. Sanchez's position and movements during the incident. It is true that redirect examination elicited a new piece of information on that topic—that Mr. Rosales saw Mr. Sanchez lower his arm after the shooting. Our cases, however, have drawn a distinction between new matters and new information about a matter that has previously been explored on cross-examination. *Compare Green*, 209 A.3d at 742-44 (concluding that recording of 911 call introduced on redirect examination was "unquestionably new," where call had not been introduced

into evidence on cross-examination but rather discrete portions of call had only been used to refresh recollection of witness 911 caller), *with Green v. United States*, 718 A.2d 1042, 1061 (D.C. 1998) (concluding that specific fact elicited about phone conversation on redirect examination was not new matter, where defense counsel previously questioned witness about phone call on cross-examination).

We acknowledge that the distinction between a new matter and new information about a previously explored matter is a question of degree. At one extreme, any new piece of information brought out on redirect examination could be viewed as a new matter. On that theory, all non-repetitive redirect examination would trigger a constitutional right to recross-examination. On the other extreme, the matter could be understood broadly to be the defendant's guilt or innocence, and all relevant information elicited on redirect examination would simply be new information on a matter that had previously been explored on cross-examination. Our cases unsurprisingly reflect an intermediate approach rather than either extreme. In our view, this case fits comfortably with prior decisions holding that recross-examination was not constitutionally required, because redirect had generated only additional information on a topic that had been explored on cross-examination. *See, e.g., Tyer v. United States*, 912 A.2d 1150, 1160, 1162 (D.C. 2006) (discerning no new issue raised on redirect examination, where United States read witness portions

of witness's prior written statement, previously only summarized by defense counsel, and portions of witness's grand jury testimony, because United States "merely expanded on issues already raised prior to redirect examination"); *Singletary*, 383 A.2d at 1074 (concluding that evidence of precise duration of robbery elicited on redirect examination did not raise new matter, where other details relating to witness's opportunity to view assailant's face were covered on direct examination and cross-examination).

Second, Mr. Sanchez had a full opportunity to question Mr. Rosales on the precise point elicited on redirect examination. Our cases give substantial weight to this consideration. *See, e.g.*, *Dowtin v. United States*, 999 A.2d 903, 912 (D.C. 2010) (concluding that trial court appropriately refused request for recross-examination, where "redirect raised no new matters that [defendant] could not have explored on cross-examination in the first instance"); *Washington*, 760 A.2d at 195 (affirming decision to decline to allow recross-examination where trial court "noted that defense counsel had had an opportunity to ask [the requested] question earlier on cross-examination, but had not done so").

Taken together, these considerations lead us to conclude that Mr. Sanchez's constitutional right to confront witnesses was not violated. We are not persuaded by

Mr. Sanchez's argument to the contrary. First, Mr. Sanchez argues that the trial court's ruling reflected a misunderstanding of the facts and a failure to apply the correct legal standard. Because we are deciding this issue de novo, we need not address those alleged errors in the trial court's reasoning. *Cf. Claytor v. Owens-Corning Fiberglas Corp.*, 662 A.2d 1374, 1382 (D.C. 1995) ("[B]ecause this court reviews summary judgment *de novo*, we need not follow the same legal theory as the trial court in order to affirm its ruling.") (citation and internal quotation marks omitted).

Second, Mr. Sanchez argues that the "lowered arm" comment was a new matter because the comment contradicted Mr. Sanchez's prior testimony. Our cases establish, however, that entitlement to recross-examination is not established simply because an answer on redirect examination contradicts earlier testimony. *See, e.g.*, *Scales v. United States*, 687 A.2d 927, 932-35, 936 n.13 (D.C. 1996) (no new matter requiring recross-examination where: witness identified defendant as shooter on direct examination; on cross-examination witness called into question prior identification of defendant; witness recanted prior identification on redirect examination; and United States then, also on redirect examination, introduced as substantive evidence grand-jury testimony in which witness identified defendant).

Finally, Mr. Sanchez relies on *Green*, 209 A.3d at 740. *Green* is distinguishable. There, defense counsel cross-examined a witness about the witness's recollection of certain statements she made to a 911 operator, using "snippets" of the recorded call to refresh the witness's recollection. *Id.* at 740. No portion of the call was admitted into evidence at that point. *Id.* at 742. Instead, the call was used only as "a memory aid for the witness." *Id.* at 740 n.2, 742. On redirect examination, the United States moved the entire recording of the call into evidence. *Id.* at 740. Under those circumstances, "[t]he recording itself was unquestionably new" because of both the form and the completeness of the material introduced on redirect examination. *Id.* at 742. "[*N*]*one* of the recording was properly before the factfinder at the beginning of the government's redirect examination," and although defense counsel played portions of the call during cross-examination to refresh the witness's recollection, that use differed significantly from the near-contemporaneous record of the call in its entirely. *Id.*

This case differs from *Green* in two important respects. First, unlike *Green*, this case does not involve proposed recross-examination about a topic as to which substantive evidence was first elicited on redirect examination. Second, defense counsel in this case cross-examined Mr. Rosales extensively about where Mr. Sanchez's hands were and what they were doing. This case, unlike *Green*, thus

clearly implicates the principle that recross-examination is generally not required when defense counsel had a full opportunity to ask the question at issue. *E.g.*, *Dowtin*, 999 A.2d at 912. In sum, *Green* does not support a conclusion that Mr. Sanchez's Confrontation Clause right was violated when the trial court did not permit recross-examination in this case.

In sum, we affirm the trial court's ruling that Mr. Sanchez was not constitutionally entitled to recross-examination in the circumstances of this case.

### III. New-Trial Motions

### A. Factual and Procedural Background

At trial, Brianna Miller, a forensic scientist working in the crime-scene unit of the D.C. Department of Forensic Sciences, testified about ballistic and other physical evidence at the crime scene. Ms. Miller testified during direct examination that she had examined Mr. Rosales's car on the night of the shooting. Ms. Miller further testified:

> The way the glass broke was very interesting to me. In my years of experience of dealing with vehicles that have been

shot at, shot up, . . . I'd never seen the glass break this way if the shooter was outside of the vehicle. The only way, in my experience, for the glass to break that way would be if the shooter were inside the vehicle.

In response to further questioning, Ms. Miller explained that although the outward bend of the windshield glass indicated where the bullet was traveling, that did not specifically tell Ms. Miller where the shooter was.

After Mr. Sanchez was found guilty but before he was sentenced, the Department of Forensic Sciences informed the United States that around three weeks before Ms. Miller testified at Mr. Sanchez's trial, Ms. Miller received an email informing her that she would be suspended because of her negligent handling of evidence in another case. The United States notified the trial court and defense counsel the following day.

Mr. Sanchez filed a motion for a new trial and for sanctions based on the information about Ms. Miller's discipline. He argued that the delayed disclosure of that information denied him a fair trial, because defense counsel could have impeached Ms. Miller on cross-examination with the information about the disciplinary action taken against her. The trial court denied Mr. Sanchez's motion.

After the appeal was noted in this case, Mr. Sanchez filed a second new-trial motion, alleging that newly discovered information indicated that an attorney in the United States Attorney's Office was aware of the discipline against Ms. Miller as early as the middle of August 2019, well before Mr. Sanchez was sentenced in this case. That motion is still pending in the trial court.

## B. Analysis

In light of the newly discovered evidence he presented to the court in his second new-trial motion, Mr. Sanchez asks this court to remand for the trial court to consider his second new-trial motion. The United States agrees to that relief, which we therefore grant.

Mr. Sanchez asks this court to direct the trial court to hold an evidentiary hearing on the second new-trial motion. The United States argues that we should leave the decision whether to hold an evidentiary hearing to the trial court on remand. We conclude that holding an evidentiary hearing would be "just in the circumstances." D.C. Code § 17-306. We therefore direct that an evidentiary hearing be held on remand. In directing an evidentiary hearing on remand, we express no view on the merits of the motion.

Mr. Sanchez also asks this court to review certain conclusions that the trial court reached in ruling on the first new-trial motion. The United States has not addressed those issues on the merits, given the parties' agreement that in any event the matter should be remanded for further consideration of the second new-trial motion. Moreover, it is not clear whether those issues will arise again on remand and if so in what factual context. *Cf. Abney v. United States*, 273 A.3d 852, 870 (D.C. 2022) (declining to decide certain evidentiary issues where it was "unclear whether, and if so how, issues would arise on remand"). Under the circumstances, we decline to address those issues at this time.

## IV. Merger of Convictions

Mr. Sanchez argues that several of his convictions must be vacated because they merge under the Double Jeopardy Clause. The United States does not contest that argument, and we grant the requested relief. *See Duffee v. District of Columbia*, 93 A.3d 1273, 1274 (D.C. 2014) (accepting District of Columbia's concession that defendants' convictions merged into single offense). We therefore vacate two of Mr. Sanchez's convictions for possession of a firearm during a crime of violence, one of Mr. Sanchez's convictions for obstruction of justice, and Mr. Sanchez's

conviction for assault with significant bodily injury while armed. Mr. Sanchez does not argue that resentencing is needed, and the United States takes the position that resentencing is not required. We therefore remand for entry of a new judgment and commitment order.

In sum, we vacate the specified merging convictions, affirm the remaining convictions, remand for entry of a new judgment and commitment order, and remand for further proceedings, including an evidentiary hearing, with respect to Mr. Sanchez's second new-trial motion.

*So ordered.*