**Felix ALLIEGRO, Appellant,**

v.

**ACANDS, INC., Appellee.**

**No. 95–CV–536.**

District of Columbia Court of Appeals.

Argued Feb. 20, 1997.

Decided March 20, 1997.

Keith E. Haynes, Columbia, MD, with whom Gary J. Ignatowski and Andrew M. Cantor, Baltimore, MD, were on the brief, for appellant.

Dana C. Peterson, Portola Valley, CA, for appellee.

Before SCHWELB, RUIZ and REID, Associate Judges.

REID, Associate Judge:

Appellant Felix Alliegro filed an action against appellee ACandS, Inc., alleging, *inter alia,* negligence and strict liability resulting from his exposure to asbestos-containing materials used by appellee, and his development of asbestosis.[1] He sought compensatory and

---

**1.** Mr. Alliegro's action was one of several brought by different plaintiffs against ACandS, Inc. His case was tried together with actions filed by Harold Tewell, John Peterson, Thomas Linkous and Henry Hoffman. Only Mr. Alliegro's case is before us on appeal.

punitive damages. In phase one of the trial, which focused on Mr. Alliegro's exposure to Armstrong products [2] and whether that exposure was a substantial contributing factor to the development of his asbestosis, the trial court directed a verdict on behalf of appellee. Mr. Alliegro filed a timely appeal. He contends that the trial court erred in directing a verdict in appellee's favor. We reverse and remand.

## FACTUAL SUMMARY

From around 1960 or 1961 to his retirement in 1969, Mr. Alliegro worked continuously as a stationary engineer at the Bureau of Engraving and Printing, a five story building with several wings.[3] His job involved making adjustments to heat and humidity supply systems.[4] The building was heated by steam which moved through steam pipes. Between 1965 and 1967, an extensive renovation of the heating system took place; asbestos-containing products were used in the renovation.[5] Among those working on the renovation throughout the building were pipe coverers. Alliegro's responsibilities for controlling heat and humidity in each section of the building took him continuously into areas where the pipe coverers were working. During his phase one trial, Mr. Alliegro testified that he saw the pipe coverers using asbestos covering for the pipes. He explained that his work controlling temperature and humidity was "a continuous process," and that he would go into areas where pipe coverers were working "as frequently as necessary because if this section of the building called for a certain temperature and certain amount of humidity to-

day, tomorrow they may call for a change in the temperature and humidity." [6] He had the "run of the building."

Mr. Alliegro was in the vicinity of pipe coverers when they cut pipe covering to fit the pipe size. He was exposed to dust from the cutting process. He testified that "dust would linger on in that area that you're working and it would fall on your clothes.... The dust would be flying all over the place until the job was completed...." He was also exposed to flying dust during the process of mixing what was known as "mud," a powder asbestos-containing base, with water. He used no breathing devices when he came into contact with the dust.

Mr. Alliegro testified that he experiences shortness of breath, pains across the chest, and has had to curtail work around the house. He no longer drives, except two or three miles to the grocery store. He has to rest after fifteen or twenty minutes of activity. His breathing has gotten worse over the years and he fears that he has asbestosis.

Joseph John Bollo, III, a specialist in sheet metal work, was employed from 1965 to 1967 by a company that remodeled and reinstalled the heating system at the Bureau of Engraving and Printing. He worked "hand in hand" with steam fitters and pipe coverers. He also worked around the Bureau of Engraving and Printing's stationary engineers, and they worked around him, although he could not recall having seen Mr. Alliegro. He indicated that the heating system, which Mr. Alliegro had to adjust continuously, was in "every base of every wing" of the building, and that under the remodeling project, the contractor

2. An historic relationship exists between Armstrong products and ACandS, Inc. ACandS, Inc. was incorporated in 1957 as a subsidiary of Armstrong Cork Co., and was first called Armstrong Contracting and Supply. *See ACandS, Inc. v. Godwin*, 340 Md. 334, 667 A.2d 116, 129, 139 (1995).

3. In addition to the main building, there was an annex.

4. Mr. Alliegro worked either the day shift from 7:30 to 3:30, or the afternoon shift from 3:30 to 11:30, five days a week.

5. Mr. Alliegro had been exposed previously to asbestos-containing products. His first encoun-

ter occurred between 1935 and 1938 while he was an apprentice in the Coast Guard. During the war years, between 1939 and 1946, he handled asbestos-containing pipe covering while assigned to Navy ship yards. From 1946 to 1961, he was exposed to or handled asbestos-containing products while working as an engineer for the Federal Work Administration, the White House, and the Treasury Department.

6. Constant changes in temperature and humidity were required because of the nature of the work being done at the Bureau of Engraving and Printing.

was "putting in air conditioning and new heating in [the] entire building."

Mr. Bollo described the work of pipe coverers and the "cloud" that would result from their work during the period 1965 to 1967. The room in which the work took place appeared to be "smoky" and there was no ventilation. He identified Armstrong as the manufacturer of the pipe covering that was being used for the remodeling job. When asked how he knew Armstrong products were being used, Mr. Bollo replied, "[b]ecause it said Armstrong on the box."

According to Mr. Bollo, the "mud" that was used to mix material was a "white or off-white powder base." When it was poured out of the brown bags in which it was contained, the powder base would "take off." He analogized "taking off" to flour that has been poured from a bag. At the Bureau of Engraving and Printing, the powder base was poured on a table or in a bucket and "would just cloud up." It would float, become "suspended" and "just sit there." When asked whether he knew the brand name or manufacturer of the mud material, Mr. Bollo responded, "[y]ou're talking about the powder form that came in a bag. That was Armstrong."

Dr. David Albert Schwartz, an Associate Professor at the University of Iowa, who is board certified and a specialist in both occupational and pulmonary medicine and who had examined Mr. Alliegro, testified in his behalf. When asked whether Mr. Alliegro had pulmonary asbestosis to a reasonable degree of medical certainty, he responded "yes." Dr. Schwartz used Mr. Alliegro's 1994 chest x-ray to identify his "asbestosis or pulmonary fibrosis associated with asbestos exposure." In response to hypothetical questions regarding exposure to Armstrong asbestos-containing pipe covering over the course of two years, Dr. Schwartz stated:

My opinion is that every exposure contributed substantially to the development of [Mr. Alliegro's] pulmonary fibrosis, and contributed to the progression of his asbestosis.... Each and every dose contributes to the risk of developing the disease and also contributes to the risk of progressing once you have the disease. So

it's impossible to pick out one particular exposure and say that's the culprit. Each and every exposure contributes to it and that's been shown in a number of different studies that there's this dose response relationship. The more you get exposed, the higher your risk of developing the disease is and the more you get exposed, the higher your risk of progressing with that disease.

Dr. Schwartz was asked the following question:

I want you to assume that Mr. Alliegro worked as an operating engineer in the 1960's and that over the course of two years he worked in the vicinity of insulators who were reconstructing a building [and] who handled and mixed and applied Armstrong asbestos-containing cement in his vicinity and that the mixing of this material created large quantities of ... asbestos-containing dust to which Mr. Alliegro was exposed and which he inhaled and that this material did contain asbestos. Doctor, do you have an opinion to a reasonable degree of medical certainty as to which if any of those exposures over that two year period in the 1960's was a substantial contributing factor [to] the development of Mr. Alliegro's pulmonary asbestosis?

He responded: "Yes, I do. All of those exposures substantially contributed to his risk of developing asbestosis and his risk of progressing once he developed asbestosis."

The trial judge directed a verdict for ACandS, Inc., concluding:

I do not feel that there is sufficient evidence, even with the inferences, for the jury to do anything other than speculate that Mr. Alliegro was in and around areas where Armstrong pipe covering and cement were being used. Given the size of the building, the vagaries of the testimony of Mr. Bollo and ... Mr. Alliegro, I cannot conclude that anything other than speculation would put Mr. Alliegro in the vicinity of Mr. Bollo, at a time when there is enough proof to show that Armstrong pipe covering and cement was being used to create the dust.

... There is on the evidence, within inferences due to the plaintiff, sufficient evidence to conclude that Mr. Alliegro had a sufficient exposure to asbestos. But there is not sufficient evidence to show that he had a sufficient exposure to Armstrong products.

## ANALYSIS

■■■ We review the evidence in the light most favorable to Mr. Alliegro, "who must be given the benefit of all reasonable inferences to be drawn from the evidence." *Abebe v. Benitez,* 667 A.2d 834, 836 (D.C.1995). "[T]he judge is not the trier of fact" on a motion for a directed verdict, and " 'must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting [his or her] judgment for that of the jury,' " *Id.* (quoting *Pazmino v. WMA-TA,* 638 A.2d 677, 678 (D.C.1994)). Furthermore, "[a]s long as there is some evidence from which jurors could find that the party has met its burden, a trial judge must not grant a directed verdict." *Id.* (referencing *Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1978) (other reference omitted)).

Here, the trial judge granted ACandS, Inc. a directed verdict in phase one of the case, which was divided into three phases.[7] Under phase one, a plaintiff had to show that he was exposed to Armstrong products, and that that exposure was a substantial contributing factor to the development of his asbestosis.[8] In phase two, according to the trial judge, a determination would be made as to which defendants, if any, ultimately were liable for

a plaintiff's asbestosis or mesothelioma, if the disease had progressed to cancer.[9] In phase three, responsibility of defendants for punitive damages, if any, would be decided.[10]

Mr. Alliegro contends that in directing a verdict for ACandS, Inc., the trial court erred in relying on a substantial factor standard applied in *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156 (4th Cir.1986). ACandS, Inc. maintains that the trial court properly applied the *Lohrmann* standard. Under the *Lohrmann* standard, "there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." 782 F.2d at 1162–63. Mr. Alliegro argues that the appropriate substantial factor standard is that enunciated in a decision handed down by this court after his phase one trial, *Claytor v. Owens–Corning Fiberglas Corp.,* 662 A.2d 1374 (D.C.1995).

In *Claytor,* we said,

> [W]e need not follow the same legal theory as the trial court. . . . Thus this court need not decide whether to adopt a new, asbestos-specific test based on *Lohrmann* because, under the existing District of Columbia law . . . the result in this case would be the same as it would be under *Lohrmann.* Moreover, there can be no doubt that both *Lohrmann* and our own case law are derived from the same source, section 431 of the Restatement. . . . *Lohrmann* makes clear that its specialized test for asbestos cases is merely an elaboration of the Restatement's "substantial factor" test

---

7. The trial court did not enter a written trifurcation order. During the phase one trial, there appeared to be some confusion concerning the difference between phase one and phase two of the case.

8. During the course of the trial, the trial judge indicated that phase one focused on "whose product may have caused the injury, if there is in fact an injury." The joint pre-trial statement of the parties stated that "Phase [o]ne will focus on product identification, compensatory damages and medical causation." During trial, counsel for one of the plaintiffs said that in phase one "the question for the jury is was the exposure to the Armstrong products a substantial-contributing factor to the development of [asbestosis]."

9. The trial judge identified the issue in phase two as "who ultimately has the liability." According to the parties' joint pre-trial statement, "[p]hase [two] will focus on liability issues as to any remaining Defendants."

10. The parties' joint pre-trial statement pointed out that "[p]hase [t]hree will focus on whether any of the remaining Defendants are liable for punitive damages." The joint pre-trial statement also identified a fourth phase: "[p]hase [f]our will focus on the amount of punitive damages, if any, to be assessed against each of the remaining Defendants."

applicable to any determination of proximate cause. 782 F.2d at 1162.[11]

*Id.* at 1382.

We conclude that the trial court erred in directing a verdict in behalf of ACandS, Inc., and that *Claytor* compels us to reverse and remand this matter to the trial court. Under our standard of review, the testimony of Mr. Alliegro, Mr. Bollo and Dr. Schwartz, and the inferences therefrom to which Mr. Alliegro was entitled, were sufficient to require the submission of his phase one case to the jury. First, Mr. Alliegro recounted his exposure to asbestos-containing products during the 1965 to 1967 remodeling at the Bureau of Engraving and Printing. Second, Mr. Bollo, who worked on the remodeling project with the outside contractor, identified Armstrong asbestos-containing products as used in the remodeling project, described the heating system that was being remodeled as located in "every base of every wing" of the Bureau of Engraving and Printing, and testified that stationary engineers employed by the Bureau of Engraving and Printing were exposed to clouds of suspended dust. Third, Dr. Schwartz, an expert in both occupational and pulmonary medicine, testified that Mr. Alliegro suffered from asbestosis, and opined, to a reasonable degree of medical certainty, that assuming use of Armstrong asbestos-containing products in the remodeling project, these products constituted a substantial factor in the development and progression of Mr. Alliegro's asbestosis.

Clearly this is a complicated case, and the trial judge exerted great effort in structuring and moving it along. In considering the motion for a directed verdict in phase one of the case, which was not the ultimate liability phase of the case, the trial judge rejected the testimony of Mr. Alliegro and Mr. Bollo as insufficient to permit consideration of the case by the jury, by referencing the alleged "vagaries" of the testimony and the size of the Bureau of Engraving and Printing. Exactly what the trial judge had in mind by the use of the word "vagaries" is not clear. Mr. Alliegro is an elderly man and the trial judge may have thought that he wandered in communicating his thoughts; and Mr. Bollo may have appeared flippant to the trial judge at times during his testimony. However, it was the responsibility of the jury alone to weigh the evidence and assess credibility.

With respect to the size of the Bureau of Engraving and Printing, Mr. Alliegro testified that he had "the run of the building" and was responsible for controlling the heating system. Mr. Bollo recalled that the heating system was located in "every base of every wing" of the building, and that under the remodeling project, the contractor was "putting in air conditioning and new heating in [the] entire building." He worked "hand in hand" with pipe coverers who used Armstrong asbestos-containing products, and worked around stationary engineers who were employed by the Bureau of Engraving and Printing. When asked who manufactured the pipe covering that was being used by the contractor, Mr. Bollo said "Armstrong." When questioned as to how he knew Armstrong products were being used in the remodeling project, he stated, "[b]ecause it said Armstrong on the box." In addition, the white powder base or mud material came in an Armstrong brown bag. From this testimony, reasonable jurors could infer that Mr. Alliegro was exposed to Armstrong asbestos-containing products. Hence, because there was "some evidence" that the exposure to Armstrong products constituted a substantial contributing factor to the development and progression of Mr. Alliegro's asbestosis, his phase one case should have been submitted to the jury.

In *Claytor, supra,* we said, *inter alia,* "that we are not requiring appellants to present direct evidence of their exposure to specific

---

11. In *District of Columbia v. Frick,* 291 A.2d 83, 84 (D.C.1972), we adopted the substantial factor, proximate cause standard set forth in the Restatement (Second) Of Torts § 431 (1965) which states:

The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

*See also Lacy v. District of Columbia,* 424 A.2d 317, 320 (D.C.1980).

asbestos products, or testimony from others who could verify appellants' presence during the use of specific asbestos products, because we agree that '[s]uch burden is unreasonable.'" 662 A.2d at 1384 (quoting *Roehling v. National Gypsum Co. Gold Bond Bldg. Products,* 786 F.2d 1225, 1228 (4th Cir.1986)). Rather, we stated, "[w]hat is minimally required ... is proof that appellants and defendants' products were in the same place at the same time." *Id.* at 1384–85. Here, Mr. Alliegro, a stationary engineer at the Bureau of Engraving and Printing, testified that he had the "run of the building," that he worked on the heating system and had to control the temperature and humidity in all parts of the building between 1961 and 1969. Mr. Bollo, a sheet metal apprentice with the remodeling contractor, confirmed the use of Armstrong asbestos-containing products on the heating system at the Bureau of Printing and Engraving between 1965 and 1967. ACandS, Inc. was incorporated in 1957 as a contracting subsidiary of Armstrong Cork Co.; its previous name was Armstrong Contracting and Supply. *See ACandS, Inc. v. Godwin, supra,* 667 A.2d at 129, 139. Therefore, reasonable jurors could reasonably infer that Mr. Alliegro had been present in the area when the remodeling contractor used Armstrong asbestos-containing products to remodel the heating system, and that Mr. Alliegro inhaled the asbestos dust because it was visible to the naked eye as a "cloud" or "smoky" substance that "suspended" itself in the air. Dr. Schwartz testified that "every exposure [of Mr. Alliegro to asbestos] contributed substantially to the development of his pulmonary fibrosis, ... his asbestosis and contributed to the progression of his asbestosis." Clearly, there was "some evidence from which jurors could find that [Mr. Alliegro] ... met [his] burden." *Abebe, supra,* 667 A.2d at 836. Indeed, "we are convinced that there was sufficient evidence presented at trial which, if accepted as true, would permit the jury to find in [Mr. Alliegro's] favor" with regard to phase one of his case. *Id.*[12]

12. We believe, also, that there was sufficient evidence introduced to satisfy the *Lohrmann* substantial factor standard because there was testimony that Mr. Alliegro was exposed to

For the foregoing reasons, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

*Reversed and remanded.*

Armstrong asbestos-containing products "on a regular basis over an extended period of time in proximity to [the areas in which he] actually worked." 782 F.2d at 1162–63.