William A. BRAGG and Samuel
A. Freas, Appellants,

v.

OWENS–CORNING FIBERGLAS
CORPORATION, Appellee.

Owens–Corning Fiberglas Corporation,
Appellant,

v.

William A. Bragg and Samuel
A. Freas, Appellees.

No. 95–CV–1566, 96–CV–182,
95–CV–1576, 96–CV–179.

District of Columbia Court of Appeals.

Argued Jan. 8, 1998.
Decided Aug. 5, 1999.

Kenneth D. Bynum, with whom Peter C. DePaolis, Washhington, DC, was on the brief, for William Bragg and Samuel Freas.

John P. Sweeney, with whom Dan Friedman was on the brief, for Owens–Corning Fiberglas Corporation.

Before TERRY, RUIZ and REID, Associate Judges.

TERRY, Associate Judge.

Owens–Corning Fiberglas Corporation was for many years the manufacturer and distributor of Kaylo, an insulation product containing asbestos and other materials. William Bragg and Samuel Freas filed suit against Owens–Corning, seeking compensation for injuries allegedly resulting from their exposure to asbestos.[1] Following a lengthy, multi-phased trial, the jury rendered a verdict in favor of Bragg and Freas and awarded them $200,000 and $70,000 in damages, respectively. The trial court then denied Owens–Corning's request for judgment notwithstanding the verdict, entered judgment in favor of Bragg and Freas against Owens–Corning, and allotted *pro rata* credits against the awards for settlement proceeds from the Manville Personal Injury Settlement Trust ("the Manville Trust" or "the Trust").[2]

Bragg and Freas contend on appeal[3] that the trial court erred in allotting *pro rata* credits against the awards. Owens–Corning argues in its cross-appeals that the trial court erred in refusing to grant its motion for judgment n.o.v. Specifically, Owens–Corning maintains that the evidence was insufficient to establish that its product, Kaylo, was a "substantial factor" in causing Bragg's injury and that both Bragg and Freas failed to establish through expert testimony that Kaylo proximately caused their injuries. We find all of these arguments meritless and affirm the judgment in its entirety.

## I. PROCEEDINGS IN THE TRIAL COURT

The cases in the consolidated trial group were tried in five separate phases. In Phases One and Two, which focused on appellants' exposure to Owens–Corning's product and whether that exposure was a substantial contributing factor to their injuries, the jury found for appellants. In Phase Three, which concerned punitive damages, the jury rejected appellants' claim that Owens–Corning acted willfully, wantonly, or recklessly, and accordingly declined to award punitive damages. Phase Four had originally been reserved for a determination of Owens–Corning's ability to pay punitive damages; however, in light of the outcome of Phase Three, Phase Four was omitted, and the trial moved to the contribution phase, Phase Five. At the end of Phase Five, the court ruled that Owens–Corning was entitled to a *pro rata* set-off for appellants' share of the settlement with the Manville Trust.

### A. *The Evidence at Trial*

Appellant Freas, who worked as a heating and plumbing contractor from 1952 until 1981, testified that he came in contact with Owens–Corning's Kaylo on several

---

1. Appellants' cases, along with ten others based on similar claims, were consolidated for trial in the Superior Court under the group name "June 1994 Asbestos Trial Group."

2. The Manville Trust, which we shall discuss in greater detail in part III–A of this opinion, was created to provide a mechanism for payment of asbestos-related personal injury claims after the Johns–Manville Corporation, a manufacturer of asbestos products, entered bankruptcy. *See In re Joint Eastern & Southern Districts Asbestos Litigation* (*"Asbestos Litigation III"*), 878 F.Supp. 473, 479 (E. & S.D.N.Y.1995).

3. For convenience, we shall refer to Mr. Bragg and Mr. Freas throughout this opinion as "appellants," even though as to some issues they are appellees.

occasions throughout his career.[4] First, from 1955 to 1957, while working for a private contractor repairing and replacing residential boilers, he insulated boilers and the piping attached to them with Kaylo block insulation. Second, in 1958, while working for a different contractor, Freas insulated boilers and hot water storage tanks with Kaylo block insulation in at least three public schools in Montgomery County, Maryland. Third, in 1968, at L'Enfant Plaza in the District of Columbia, he installed drainage and water pipes, which were then insulated with Kaylo.[5]

Appellant Bragg, who had been a steamfitter[6] since 1969, testified[7] that he worked at the Calvert Cliffs nuclear power plant in Maryland from 1971 to mid–1973. When he started there, he worked on the storage tanks outside the plant; then, after about a year, he began working on the general piping systems inside the various buildings.[8] The plant was divided into small rooms, which he described as "very clean." David Thomas, an insulator who worked at Calvert Cliffs at the same time, testified that the insulators covered the pipes and air conditioning ducts at Calvert Cliffs with Kaylo insulation, which was brought to the job site "by the tractor-trailerload."

Mr. Bragg installed boilers and ran piping at the Chalk Point power plant, also in Maryland, for five or six months during the latter part of 1973. Both Bragg and Russell Tarbox, an insulator, testified that the steamfitters and insulators worked together at Chalk Point and that, because of the open grated floors, the abundant dust released into the air from cutting the insulation circulated throughout the plant[9] and eventually made its way to the basement. Mr. Tarbox further stated that during 1973 and 1974 he used Owens–Corning asbestos block insulation at Chalk Point. He believed the insulation was called "Kaylo."[10] Paul Miller, an insulator who worked with Kaylo insulation at Chalk Point in 1964, also testified that whenever Kaylo was cut to fit a pipe, it released dust into the air.

From late 1973 until sometime in 1976, Mr. Bragg worked at the Walter Reed Army Hospital in the District of Columbia, where he did general piping work throughout the entire facility, "from the basement to the roof." While Mr. Bragg was installing piping, insulators at the same time were insulating the piping and air ducts. Mr. Bragg testified that at Walter Reed, "piled up everywhere," were boxes labeled "Kaylo."

Dr. S. David Rockoff, called as a witness by appellants, was accepted by the court "as an expert in the fields of diagnostic chest radiology and diagnosis of pneumoconiosis, the diagnosis of the disease asbes-

---

4. Mr. Freas also testified about working at several other jobs in the course of his career. Since they did not involve exposure to Kaylo, we have omitted that testimony from our summary of the relevant facts.

5. Mr. Freas did not testify that he worked with Kaylo at this job site, but four insulators—William Stonebraker, Robert Haun, Joseph McLaughlin, and Paul Miller—testified that the pipes at L'Enfant Plaza in 1968 were insulated with Kaylo.

6. According to Bragg's testimony, steamfitters are persons who install hot water systems, chemical systems, process piping, boilers, tanks, and other temperature control equipment. Bragg also said that steamfitters generally work in close physical proximity to insulators.

7. Like Mr. Freas, Mr. Bragg testified about working at several other jobs which did not involve exposure to Kaylo. We have omitted that testimony from our summary of the relevant facts.

8. The Calvert Cliffs facility consists of several buildings, but Mr. Bragg's testimony did not identify which buildings he worked in.

9. Mr. Tarbox said, "You couldn't use the stuff without—the dust and—you were always sawing the stuff. You had literally clouds."

10. When asked, "Did [the insulation] have a brand name?", Mr. Tarbox responded, "Kaylo, I think it was."

tosis, and interpretation of chest radiographs, CT scans, pulmonary function tests and other relevant data to help him establish the diagnosis of asbestosis." He testified that inhaling asbestos dust results in a thickening of the pleura, one of the many layers of the walls of the lungs. Such thickening makes it difficult for the affected person to breathe. Dr. Rockoff added that asbestos-induced thickening of the lungs is a progressive disease that cannot be corrected.

Dr. Rockoff, who had reviewed the reports of the physicians who examined both appellants, was asked whether he had formed an opinion to a reasonable degree of medical certainty as to whether either of them suffered from an asbestos-induced disease of the chest. He replied that each appellant suffered from both pulmonary and pleural asbestosis and that the condition of each was progressive.

Dr. Susan M. Daum was accepted by the court as an expert in internal medicine, occupational and preventive medicine, and asbestos-related diseases. She described the different tests utilized in diagnosing asbestos-related illness, the relevant occupational histories, and how asbestos affects the body. Dr. Daum also testified that asbestos exposure is inherently harmful.

Dr. Daum herself examined and tested both appellants. When asked whether she had formed an opinion to a reasonable degree of medical certainty as to whether either of them had asbestosis or an asbestos-related disease of the chest, she stated that each appellant suffered from pulmonary and pleural asbestosis that would continue to progress, and that Mr. Freas had other medical problems as well.

Dr. Nagi Khouri, who testified on behalf of Owens–Corning, was accepted by the court as an expert in the area of chest radiology. Dr. Khouri reviewed x-ray films and other medical reports relating to both appellants in order to determine the state of their health. With respect to Mr. Freas, Dr. Khouri testified that the x-rays revealed asbestos exposure, but not asbes-

tosis. The doctor believed that, although there were signs of scarring and other abnormal marks on Mr. Freas' x-rays, those marks were not indicative of asbestos disease. As to Mr. Bragg, Dr. Khouri testified that the x-ray films showed "nothing abnormal."

### B. *The Court's Post–Trial Rulings*

Following the return of the jury verdict, Owens–Corning moved for judgment notwithstanding the verdict, contending that appellants had failed to demonstrate that its product, Kaylo, had proximately caused their injuries. The trial court denied the motion. With respect to Mr. Freas, the court was "satisfied that Mr. Freas' testimony of exposure to [Owens–Corning] Kaylo when he actually installed the product in several schools in 1958 and 1959 was sufficient to present a jury question." As to Mr. Bragg, the court ruled that "[a]lthough Mr. Bragg could not identify Kaylo at any particular worksite, there [was] just enough evidence to raise a jury question as to his exposure to Kaylo." Specifically, the court noted that "Russell Tarbox, an insulator who worked [at Chalk Point] as a steamfitter, testified to the dusty air created by insulators using Kaylo products." Addressing the expert testimony, the court recognized that although neither Dr. Rockoff nor Dr. Daum "isolated Kaylo asbestos fibers as a cause of either [appellant's] asbestosis, they testified to their opinion that every exposure to asbestos-laden dust ... is a significant factor in the development of the disease." The court ruled that these opinions "dovetail[ed] with evidence of Mr. Bragg's exposure to Kaylo asbestos fibers and thus provide[d] a proper and sufficient basis upon which a jury could conclude that Kaylo was a substantial factor in causing his disease." In a separate order, using virtually identical language, the court reached the same conclusion regarding Mr. Freas.

Owens–Corning also moved for a *pro rata* set-off against the awards for settlement proceeds from the Manville Trust.

In a lengthy written order, the court discussed the history of the Trust and the related class-action settlement and determined that the order of the United States District Court approving the settlement[11] affected the instant case as follows:

(1) Effectively, the Manville Trust is a "defendant" in each [plaintiff's] case by virtue of that plaintiff's mandatory inclusion in the class suing the Trust and by virtue of [Owens–Corning's] classification as a beneficiary with a right of contribution from the trust.

(2) The [Trust Distribution Process ("TDP")], Sec. H–1 (d), states that the Trust is to be considered "a legally responsible tortfeasor under applicable law, without introduction of further proof." ... Thus the Trust is deemed in the instant cases to be a joint tortfeasor with [Owens–Corning].

(3) The TDP provides in *pro rata* jurisdictions that set-offs to which joint tortfeasors are entitled, whether claims are liquidated or non-liquidated, "shall be either (a) the ... Trust Payment, or (b) the Trust's *pro rata* share of the judgment, as provided by applicable law." [Citations and footnote omitted.]

The court concluded that because the law in the District of Columbia provides that joint tortfeasors must share *pro rata* in any judgment, Owens–Corning, for the purpose of calculating set-offs, must be credited with the Trust's *pro rata* share of the awards. The court did note that it was "sympathetic to [appellants'] argument that their mandatory inclusion in the [case against the Manville Trust] leads to some inequitable results," but ruled nevertheless that it was bound by the federal court's order in *Asbestos Litigation III* and by established District of Columbia law.

## II. OWENS-CORNING'S APPEALS

▮ A judgment notwithstanding the verdict is appropriate only in "those cases in which the facts, viewed most favorably to the nonmoving party, permit but one reasonable conclusion as to the proper judgment." *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147, 150 (D.C.1979) (citations and footnote omitted); *accord, e.g., Lewis v. Washington Metropolitan Area Transit Authority*, 463 A.2d 666, 669 (D.C.1983). "If a case is allowed to go to the jury, and the jury returns a verdict which is unreasonable when the evidence is viewed in the light most favorable to the prevailing party, the entry of a judgment n.o.v. is the appropriate remedy." *Bauldock v. Davco Food, Inc.*, 622 A.2d 28, 32 (D.C.1993) (citations omitted). However, the trial court may not set aside the jury verdict as against the weight of the evidence simply because it would have reached a different result if it had been the trier of fact. *Lyons v. Barrazotto*, 667 A.2d 314, 325 (D.C.1995). The trial court "must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting its judgment for that of the jury." *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979) (citation omitted); *accord, e.g., Robinson v. Group Health Ass'n*, 691 A.2d 1147, 1150 (D.C. 1997).

▮ The issue of proximate cause is usually a question of fact for the jury to decide. *District of Columbia v. Freeman*, 477 A.2d 713, 716 (D.C.1984); *McCoy v. Quadrangle Development Corp.*, 470 A.2d 1256, 1259 (D.C.1983). Only if there are absolutely no facts or circumstances from which a jury could reasonably find that the defendant was negligent, and that such negligence was the proximate cause of injury, would the matter be a question of law for the court. *Id.; see Claytor v. Owens–Corning Fiberglas Corp.*, 662 A.2d 1374, 1382 (D.C.1995). When the question of the defendant's causation "remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." W. PAGE KEETON, *et al.*, PROSSER & KEETON ON THE LAW

---

11. *See Asbestos Litigation III, supra* note 2.

OF TORTS § 41, at 268–69 (5th ed.1984); *see District of Columbia v. Freeman, supra,* 477 A.2d at 716 (the question "becomes one of law . . . when the evidence . . . will not support a rational finding of proximate cause").

 In reviewing the denial of a motion for judgment n.o.v., we apply the same standard as the trial court. *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986) (citing cases). "[W]e must balance the evidence against the judge's determination and in favor of the jury's." *Baker v. D.C. Transit System, Inc.,* 248 A.2d 829, 831 (D.C.1969).

> The question . . . is not whether there is sufficient evidence in the record to support the findings and decision of the judge, but whether there is evidence upon which reasonable [persons] might differ as to negligence and other elements of liability; whether a jury of reasonable [persons] could properly have reached a verdict in favor of appellant[s], the part[ies] upon whom the onus of proof was imposed.

*Id.* (citation omitted).

 In any product liability case, including cases involving asbestos, it is incumbent on the plaintiff "to show that the defendant's product was the cause of his or her injuries." *Claytor,* 662 A.2d at 1382. The complaining party "must identify the manufacturer or distributor of the particular product which caused, or was a substantial cause of, his or her injury." *Id.* at 1383.[12] However, as we said in *Claytor,* another asbestos case, "we are not requiring appellants to present direct evidence of their exposure to specific asbestos products, or testimony from others who could verify appellants' presence during the use of specific asbestos products, because we agree that '[s]uch burden is unreasonable.'" *Id.* at 1384 (citation omitted). Rather, "[w]hat is minimally re-

quired . . is proof that appellants and the defendants' products were in the same place at the same time." *Id.* at 1384–1385 (footnote omitted).

 The testimony of Mr. Bragg, Mr. Tarbox, Mr. Miller, Dr. Rockoff, and Dr. Daum, and the inferences from that testimony to which Mr. Bragg was entitled, were sufficient to raise an issue for the jury concerning his exposure to Owens–Corning's product. First, Bragg testified that he worked at Chalk Point in 1973 and that, because of the open floor grating, dust from the insulators working above him permeated the air all the way down to the basement. Second, Russell Tarbox testified that he used Owens–Corning's Kaylo at Chalk Point in 1973, when Mr. Bragg was also there. Third, Paul Miller testified that whenever he cut Kaylo to fit a pipe, it released dust into the air. Fourth, both Drs. Rockoff and Daum opined, to a reasonable degree of medical certainty, that Mr. Bragg had been exposed to asbestos and was suffering from progressive asbestosis. That evidence, viewed as a whole, was sufficient to permit the jury to determine whether Mr. Bragg was exposed to Owens–Corning's product (not just asbestos in general) to such a degree that Owens–Corning might be liable for his asbestos-related illness. *See Alliegro v. ACandS, Inc.,* 691 A.2d 102, 106 (D.C.1997); *Claytor,* 662 A.2d at 1384–1385.

 In addition, a jury could reasonably infer that Mr. Bragg was exposed to Owens–Corning's Kaylo while he was working at Walter Reed Hospital. He testified that at Walter Reed he worked throughout the entire building, "from the basement to the roof." While he was installing piping, insulators at the same time were insulating the piping and the air ducts. Furthermore, Mr. Bragg testified

---

12. Sufficiency is an issue only with respect to Mr. Bragg, except as to the expert testimony, to which we shall turn in a moment. There is no dispute on appeal about the sufficiency of

the evidence to permit the jury to find that Kaylo was a substantial factor in causing Mr. Freas' asbestos-related illness.

that he saw boxes labeled "Kaylo" stacked all over the job site, "piled up everywhere." This evidence was sufficient to allow a jury to infer that Mr. Bragg was exposed to Kaylo while working at Walter Reed. *See Alliegro,* 691 A.2d at 106–107 (holding that evidence was sufficient when plaintiff testified that he worked side-by-side with pipe coverers using the defendant's asbestos products).[13]

 Owens–Corning also challenges the testimony of the expert witnesses, arguing that they failed to establish that Kaylo proximately caused appellants' injuries. In personal injury cases, expert medical testimony is almost always required to prove causation unless

> (1) the injury develops coincidentally with, or within a reasonable time after, the negligent act, or (2) the causal connection is clearly apparent from the illness [or injury] itself and the circumstances surrounding it, or (3) the cause of the injury relates to matters of common experience, knowledge, or observation of laymen.

*Williams v. Patterson,* 681 A.2d 1147, 1150 (D.C.1996) (citation omitted). Although Owens–Corning is correct in pointing out that none of these exceptions apply to the instant case, Owens–Corning is incorrect in asserting that appellants failed to present sufficient expert testimony on the issue of proximate cause. Drs. Rockoff and Daum each testified, to a reasonable degree of medical certainty, that both appellants had "asbestos-induced" or "asbestos-related" diseases of the chest. From the very words the doctors used, a jury could reasonably infer that an "asbestos-induced" or "asbestos-related" disease is proximately caused by exposure to asbestos. Given the evidence that both appellants were exposed to Owens–Corning's Kaylo,[14] a jury could reasonably infer from all the evidence that their illnesses were caused by Owens–Corning's product. *See, e.g., Alliegro,* 691 A.2d at 106 (finding evidence legally sufficient when expert "testified that [plaintiff] suffered from asbestosis, and opined, to a reasonable degree of medical certainty, that assuming use of [defendant's] asbestos-containing products . . . these products constituted a substantial factor in the development and progression of [plaintiff's] asbestosis"). We find this particular argument by Owens–Corning about the expert testimony very close to frivolous.

### III. Bragg's and Freas' Appeals

#### A. *The History of the Manville Trust*

A tale such as that of the Manville Trust must begin with a discussion of the nature and history of asbestos. As early as the fifth century B.C., asbestos was valued for its relative indestructibility and its resistance to heat and fire. *See In re Joint Eastern & Southern Districts Asbestos Litigation ("Asbestos Litigation I"),* 129 B.R. 710, 735 (E. & S.D.N.Y.1991) (recounting a detailed history of asbestos use),[15] *vacated,* 982 F.2d 721 (2d Cir.1992), *modified on rehearing,* 993 F.2d 7 (2d Cir.1993); *Special Project: An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation, Part I,* 36 Vand. L. Rev. 573, 578 nn. 3 & 4 (1983)

---

**13.** We need not decide whether there was also sufficient evidence to support an inference that Mr. Bragg was exposed to Kaylo while working at the Calvert Cliffs nuclear power plant in the early 1970s. David Thomas testified that he was insulating piping with Kaylo at Calvert Cliffs during the same time period that Mr. Bragg was working there, but neither man offered any testimony about the location of his own work site within the facility. The plant itself, moreover, was described as "very clean" and "broken into small rooms," a description that, in itself, would probably not support a finding that Mr. Bragg was exposed to Kaylo dust circulating in the air. *See Claytor,* 662 A.2d at 1384.

**14.** Owens–Corning admits in its brief that Kaylo contains asbestos.

**15.** The ancient Greeks used asbestos in lamp wicks, and the ancient Romans wove it into cremation cloths. *See Asbestos Litigation I,* 129 B.R. at 735.

(hereafter cited as *"Special Project"*). Beginning with the industrial age, the "mirac[ulous]" qualities of asbestos were put to use in products designed to protect persons and property. *See id.* at 578; Frank J. Macchiarola, *The Manville Personal Injury Settlement Trust: Lessons for the Future,* 17 CARDOZO L. REV. 583, 588 (1996) (discussing the many uses of asbestos in modern times). Asbestos was used as insulation in homes, offices, factories, ships, and cars. It was also used to make, among other things, cigarette filters, fireproof clothing, and fireproof theater curtains. *Id.; see also Special Project,* 36 VAND. L. REV. at 578 n. 7 (listing the many consumer applications of asbestos).

Although "[k]nowledge of the potential health hazards of asbestos ... dates back to ancient times," *Asbestos Litigation I,* 129 B.R. at 735,[16] most producers and scientists through the late nineteenth century "considered asbestos to be a virtually harmless, highly valuable ingredient in a variety of products designed to protect property and human life." *Special Project, supra,* 36 VAND. L. REV. at 578 (footnote omitted). Toward the end of the nineteenth century, however, scattered reports began to emerge concerning the dangers posed by airborne asbestos particles. *Asbestos Litigation I,* 129 B.R. at 737. In the 1920s and 1930s, more extensive evidence began to accumulate, and reports of the hazards of asbestos became widespread in medical journals. *Id.* at 737–738. Finally, by 1935, asbestos "was 'widely recognized as a mortal threat.'" *Id.* at 738 (quoting B. CASTLEMAN, ASBESTOS:

MEDICAL AND LEGAL ASPECTS 32 (2d ed.1978)). Nevertheless, despite this knowledge, the world's annual use of raw asbestos increased dramatically over the next thirty years, from half a million tons in 1934 to two and a half million tons in 1964. *Id.* at 736 (citing Selikoff, Churg & Hammond, *Asbestosis Exposure and Neoplasis,* 188 J.A.M.A. 22, 142 (1964)).

Johns–Manville Corporation, founded in 1858, was the largest manufacturer of asbestos-containing products and the largest supplier of asbestos in the United States from the 1920s until the 1970s. *Id.* at 742; *see also In re Johns–Manville Corp.,* 97 B.R. 174, 176 (Bankr.S.D.N.Y.1989). As a result, John–Manville's products "saw widespread commercial, industrial and consumer use." *Asbestos Litigation I,* 129 B.R. at 743.

As the illnesses resulting from years of exposure to asbestos started taking their toll in the 1960s, a flood of lawsuits began in the 1970s. *Id.* at 744. With the assistance of labor unions, thousands of asbestos workers brought suits against Johns–Manville. *Id.* at 745. Angered by evidence that Johns–Manville had suppressed vital information,[17] juries sought to punish the corporation by awarding punitive damages. *Id.* at 746. As the number of plaintiffs grew dramatically and jury awards escalated, Johns–Manville, once a highly successful company, began to suffer severe financial stress. *Id.* at 751. Finally, in August 1982, motivated by the "realistic fear of burgeoning asbestos-related tort claims for compensatory and punitive damages,"[18] Johns–Manville filed for reorgani-

---

16. "Pliny the Elder, the Roman historian, and Strabo, the Greek geographer, reported a lung disease in slaves weaving asbestos." *Asbestos Litigation I,* 129 B.R. at 735 (citing G. Peters and B. Peters, *Asbestos Disease Update* 7 (1989)); *see also* Macchiarola, *supra,* 17 CARDOZO L. REV. at 589.

17. In the 1930s and 1940s, Johns–Manville actively concealed information and reports regarding the hazards posed by asbestos. *Asbestos Litigation I,* 129 B.R. at 744 (citing B. CASTLEMAN, ASBESTOS: MEDICAL AND LEGAL ASPECTS

at 46–54). Moreover, suits brought against the corporation during this period by eleven workers alleging injuries caused by asbestos exposure "were settled on the express condition that the plaintiffs' attorneys would not bring similar claims against the company in the future." *Id.* (citing P. BRODEUR, OUTRAGEOUS MISCONDUCT: THE ASBESTOS INDUSTRY ON TRIAL 113–114 (1985)).

18. At that time, Johns–Manville projected its total asbestos liability at more than a billion

zation under chapter 11 of the United States Bankruptcy Code. *Id.; see also In re Johns–Manville Corp.,* 68 B.R. 618, 620 (Bankr.S.D.N.Y.1986).

Following several years of intense negotiations and litigation, a reorganization plan was developed, establishing the Manville Trust to assume the Corporation's asbestos-related liabilities. *Id.* at 635; *see also Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988) (affirming Second Amended and Restated Plan of Reorganization). The beneficiaries of the Trust include: (1) persons who are suffering, or who will in the future suffer, from asbestos-related diseases caused in whole or in part by exposure to Johns–Manville products; (2) co-defendants of Johns–Manville in asbestos-related litigation; and (3) manufacturers and distributors of Johns–Manville asbestos and asbestos products who have contribution and indemnification claims against Johns–Manville. *In re Joint Eastern & Southern District Asbestos Litigation ("Asbestos Litigation IV"),* 78 F.3d 764, 769 (2d Cir.1996). Some time later, the beneficiaries brought a non-opt-out class action against the Trust, pursuant to Rule 23 of the Federal Rules of Civil Procedure, seeking changes in its obligations and procedures. *See Asbestos Litigation I,* 129 B.R. at 767.

When the assets of the Trust quickly proved to be inadequate, the first attempt to settle the litigation was vacated. *See In re Joint Eastern & Southern Districts Asbestos Litigation ("Asbestos Litigation II"),* 982 F.2d 721 (2d Cir.1992), *modified,* 993 F.2d 7 (2d Cir.1993). The matter was remanded to the Bankruptcy Court for further proceedings, including the designation of appropriate subclasses and a precise delineation of the rights accorded to co-defendant manufacturers. *Asbestos Litigation IV,* 78 F.3d at 770 (citing *Asbestos Litigation II,* 982 F.2d at 740). Even-

tually, after the designation of new subclasses and "hard fought" negotiations among them, followed by extensive trials and motions, a modified settlement emerged ("the Settlement"). *Id.; see Asbestos Litigation III,* 878 F.Supp. at 484–512 (summarizing the history and contents of the Settlement).

### B. The Effect of the Manville Trust on This Case

Under the Settlement, the rights and duties of the Trust and all class members, as well as the procedures for processing and evaluating claims against the Trust, are governed by an annexed document known as the Trust Distribution Process ("TDP").[19] *Asbestos Litigation IV,* 78 F.3d at 770; *Asbestos Litigation III,* 878 F.Supp. at 577–578. The TDP provides that "the Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof." *Id.* at 591. The TDP then sets forth the applicable rules for contribution and set-off according to the laws of the several states and the District of Columbia:

> In general, the TDP refers to local law for the calculation of the set-off, recognizing different rules in three categories of states: *pro tanto* states, in which the judgment against nonsettling defendants is reduced by the amount paid or agreed to be paid by a released party; *pro rata* states, in which the total liability is divided equally among all defendants held to be responsible tortfeasors, and the judgment is reduced by a released party's *pro rata* share of liability; and apportionment states, in which liability is apportioned by the factfinder among those found to be tortfeasors, and the amount of the judgment is to be reduced

dollars. *Asbestos Litigation I,* 129 B.R. at 751.

19. Both appellants and Owens–Corning are beneficiaries of the Trust, *Asbestos Litigation III,* 878 F.Supp. at 485, and therefore are parties to—and bound by—this non-opt-out class action settlement agreement. *See id.* at 574, 590.

with reference to the apportioned share of a released or absent tortfeasor.

*Asbestos Litigation IV,* 78 F.3d at 770–771; *see also Asbestos Litigation III,* 878 F.Supp. at 591–594.

 In *Berg v. Footer,* 673 A.2d 1244 (D.C.1996), this court outlined the rules of contribution and set-off in the District of Columbia. When a plaintiff has settled with a party who has been deemed liable, the court awards the non-settling tortfeasor a *pro rata* credit—*i.e.,* a percentage reduction based on the number of defendants—against the verdict. *Id.* at 1248; *see Martello v. Hawley,* 112 U.S.App. D.C. 129, 132, 300 F.2d 721, 724 (1962). On the other hand, "[w]hen the plaintiff has settled with a party whose culpability has not been determined or with a party whom the finder of fact has not found liable, the court awards the non-settling defendant a credit against the verdict in the amount of the settlement, dollar for dollar (*pro tanto* )." *Berg v. Footer,* 673 A.2d at 1248–1249 (citing *Snowden v. D.C. Transit System, Inc.,* 147 U.S.App. D.C. 204, 205–206, 454 F.2d 1047, 1048–1049 (1971)). Since the TDP expressly states that the Manville Trust is to be treated "as a legally responsible tortfeasor," *Asbestos Litigation III,* 878 F.Supp. at 591, the *pro rata* rule is the proper method for calculating the amount of the set-off in the instant case. *Berg,* 673 A.2d at 1248; *see Asbestos Litigation IV,* 78 F.3d at 777 ("Because under the Settlement Agreement the Trust is deemed to be a settling joint tortfeasor, any judgment a Trust beneficiary health claimant obtains in the District of Columbia against defendants other than the Trust will be reduced *pro rata* "); *see also id.* at 771 (refusing to allow District of Columbia claimants to opt out of the Settlement, which would cap the amount received at 10 percent of the claim's value, even though "District of Columbia law would require that a judgment against a co-defendant would be reduced by the Trust's full *pro rata* share of the verdict").

Appellants cite *Asbestos Litigation II,* 982 F.2d at 730–731, for the proposition that the Manville Trust cannot be considered a joint tortfeasor. Their reliance on that decision is plainly wrong. First, the cited case cannot be regarded as interpreting the Settlement because it predated the Settlement by three years. Second, the language on which appellants rely is taken out of context and, as a result, is misleading. When read in context, the language cited by appellants merely states what the co-defendants in that case believed the court should hold, not what the court actually did hold. *See Asbestos Litigation II,* 982 F.2d at 731.

Finally, appellants argue that a *pro rata* set-off is inequitable because their "claims against the Manville Trust have been disqualified and are not in line for settlement." Appellants allege that they "have never [received] nor will they ever receive a settlement with Manville Trust." This assertion is made for the first time on appeal and thus is not entitled to consideration by this court. *See, e.g., D.D. v. M.T.,* 550 A.2d 37, 48 (D.C.1988); *Spellman v. American Security Bank,* 504 A.2d 1119, 1126 (D.C.1986); *Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967). Moreover, Owens–Corning has submitted an affidavit from Karin Croft, Director of Operations and Strategic Planning for the Manville Trust, stating that appellants' claims, at their own request, have merely been placed on inactive status so as to allow for deferral of their settlement offers. While we do not rely in any way on this affidavit in deciding (or rather, declining to decide) this claim, it does suggest that appellants' situation is not as dire as they maintain.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the trial court is in all respects

*Affirmed.*